THE CITY OF SPRINGFIELD.

THE SAMMIE.

LUTHER and others *v.* THE CITY OF SPRINGFIELD.

HARTFORD & N. Y. TRANSP. CO. *v.* THE SAMMIE.

(*District Court, S. D. New York.* January 31, 1887.)

1. COLLISION — EAST RIVER — TIDE CURRENTS — KEEPING OUT OF THE WAY — SAFE MARGIN.
 A steamer, bound to keep out of the way, must, at her own peril, shape her course for a safe margin against the contingencies of navigation, and the effects of tide currents. *Held*, in this case, that the conflict in the evidence was probably in part to be explained by the westward set of the flood-tide off Twenty-third street, which changed to the westward the course of the S., a steamer 300 feet long, as she struck the current, and that the collision was by her fault only.

2. SAME — TUG AND TOW — SUDDEN BACKING — LINES PARTED — ERROR OF JUDGMENT IN EXTREMIS NOT A FAULT.
 The collision being with a heavy car-float in tow along-side a tug, and the S. contending that the float had broken loose from the tug just before the collision, through the tug's too sudden backing, which the tug denied, *held* that, even if the lines were parted, as alleged, before the collision, the tug's backing was made necessary by the fault of the S. when the danger was imminent; and that the error, if there was any error, was one of judgment, under the excitement of the moment, and not a legal fault.

In Admiralty.
*E. D. McCarthy,* for the Sammie.
*Wilcox, Adams & Macklin,* for the City of Springfield.

BROWN, J. The collision in this case occurred at about half past 6 in the morning of November 19, 1885, in the East river, about opposite Eighteenth street, and not far from the middle of the river, between a car-float 184 feet long, lashed upon the starboard side of the tug Sammie, bound up river, and the passenger steamer City of Springfield, bound down. The starboard bow of the steamer struck the starboard corner of the float, and each was somewhat damaged. There is very perplexing conflict in regard to many of the details of this collision. Many of them it is not necessary to notice. The tide was the last of the flood. The Sammie had passed the Tenth-street buoy in about mid-river,—that is, a little to the eastward of that buoy,—and when at about Twelfth street saw the green light of the City of Springfield, which was at that time coming down between the black buoys, off Thirty-fourth street, having taken the westerly channel past Blackwell's island. The ferry-boat Rockaway was at that time crossing the river, bound for her slip at Twenty-third street. She gave a signal of two whistles to the City of Springfield, which the latter answered with two whistles, and starboarded her wheel, going under the ferry-boat's stern about opposite Twenty-third street. Two whistles were about that time given to the ferry-boat Colo-

rado, which was coming up the river ahead of the Sammie, and bound for the same slip as the Rockaway. When about opposite Twenty-third street, and under the stern of the Rockaway, the City of Springfield gave a signal of two whistles to the Sammie, which the latter answered with two. Each had the other at that time a little on her own starboard bow, and both agreed that, if their courses had been preserved unchanged, they would easily have cleared each other, starboard to starboard, by a considerable interval. Shortly after this a signal of one whistle was heard by each boat. Each attributes it to the other, and each denies that she gave any such whistle. Neither answered with one whistle; but immediately the two boats again exchanged the same signals of two whistles as before, indicating that they should pass starboard to starboard. At the same time, according to the testimony of each, the boats were backed strong, and neither changed her course, and, notwithstanding these efforts, the collision occurred. It is plain that there must be considerable error in this testimony, on one side or the other, or else there were some other circumstances not taken into account.

The City of Springfield insists that when she passed under the stern of the Rockaway, opposite Twenty-third street, she was heading from one to two points east of south, and that she maintained this course until the collision. If this were so, the collision would necessarily have happened considerably nearer to the Brooklyn than to the New York shore. I am satisfied that this is not the fact. There is, I think, a very considerable preponderance of evidence that the collision was much nearer to the New York shore than in the middle of the river. The natural course of the Springfield, from between the black buoys off Thirty-fourth street to a little east of the Tenth street buoy, which it appears was her usual course, would have brought her on the New York side. The Sammie's ordinary course carried her towards the western side of the river. The tide set that way; and the evidence is that, from the time the Springfield's first two whistles were given, the Sammie starboarded her wheel more than necessary to keep her course, and swung about a point to the westward, which would have carried her still more to the westerly half of the river. These circumstances so concur with the direct testimony of several disinterested witnesses, from other boats in the vicinity, to the effect that the collision was considerably on the New York side of mid-river, and only about one-third the distance from the New York shore, that I must find that the collision was in that vicinity rather than in mid-river or on the Brooklyn side.

The evidence from each boat is so positive that she gave no single whistle, that I think the explanation must be found in a signal heard from some other boat, which each of these boats attributed to the other. But, as the whistle was followed immediately by a repetition of two blasts from each, no harm can have come from it. It in no way accounts for or excuses the collision on either side.

On the whole evidence, it is clear that the two vessels were approaching each other all the way between Tenth and Thirty-fourth streets very nearly head and head, but, at first, each slightly on the other's starboard

bow. The testimony of the witnesses for the Sammie that they saw the red light of the City of Springfield after her green light was shut in, strongly confirms the natural inference from the place of the collision itself, that the City of Springfield must, at some time after she had first starboarded to go under the stern of the Rockaway, have turned again to the westward, if, in fact, she did at first change to one or two points east of south. In no other way could her red light have been seen, and in no other way could the Springfield have reached the place of collision. The course of S. by E. could not possibly have been continued long; only two or three minutes, at most. A speedy change was necessary in order to avoid grounding on the Brooklyn shore. A further circumstance, that is testified to very strongly by Bassenden, one of the ferry-boat pilots, called by the Springfield, possibly had an important effect in bringing the Springfield upon the Sammie's course, namely, the strong set of the flood-tide from off the Nineteenth street buoy towards the Twenty-third street slip. This witness says: "The flood-tide sets from the Nineteenth street buoy straight at Twenty-third street pier. It sets over in that cove, and runs as direct from that buoy as you can draw a line into the slip." When the City of Springfield, about 300 feet long, came down, and struck this westward current, that of itself would tend to change her heading, and sufficiently, perhaps, to explain her westerly divergence, even without any change of helm, which her witnesses so positively deny. This would explain, also, the change of the Springfield's lights from green to red, which the Sammie's witnesses testified to. And, after the Springfield had got wholly into the westward current, her starboard wheel would bring her again into the position at the collision sworn to, heading a little towards the Brooklyn shore, while her own canting to the westward with the current would give an appearance of porting to the tug.

Whether these, or some other circumstances not appearing, were the causes of this collision,—such as want of a continuous lookout on the Springfield, and proper observance of the tug, or mistake for the Jason to the westward, in the hazy morning, of which there is at least a suggestion of doubt, from the fact that none of the Springfield's witnesses observed the Sammie's lights, though they were burning,—I think this collision must be ascribed to the failure of the City of Springfield to provide a sufficient margin for safety in shaping her course to pass to starboard of the Sammie. Whatever may have been the natural effect of the tidal current, she was bound to take it into account, and provide against it. The Sammie was proceeding under one bell, and very slowly through the water. She could not change her position much in the short time after the last blasts of two whistles were given, and she was all that time backing. The City of Springfield was at that time going through the water at three or four times the speed of the Sammie. As a side-wheel steamer, she was under perfect control, even in backing, which the tug was not. It was the steamer's duty to provide a safe margin to the eastward, in accordance with her signals. The tug did all that the steamer had a right to count upon, by starboarding her

helm. The fact of the collision itself, and the little change possible to the Sammie, are conclusive evidence, to my mind, that the City of Springfield did not fulfill her duty to allow a sufficient margin for safety, as she might have done, and was bound to do, and that the blame of the collision must rest upon her.

It was strenuously contended on the trial that the hawsers that attached the float to the tug were parted before the collision, through the sudden backing of the tug; that the bows of the float were swung somewhat to the eastward, upon the tug's letting her helm run loose on backing; and that, but for this swing of the float to the eastward, no collision would have occurred. There can be no question that it was the duty of the Sammie to back when she did. It is stoutly denied by several witnesses on her part that the lines were parted except by the force of the blow of the collision. But if they were parted before the collision, through the tug's backing, I cannot regard that as any excuse for the steamer, because the danger of collision was then imminent and obvious, through the City of Springfield's fault; and, even if the backing was too strong or sudden for the strain made by so heavy a float, it was nothing more than an error of judgment in the excitement of a peril *in extremis*, for which the steamer still remains to blame. *The Elizabeth Jones*, 112 U. S. 514, 526, 5 Sup. Ct. Rep. 468. Nor had the steamer any right to go so near to the tug, without reason or necessity, and to make no allowance for such contingencies of navigation. *The Columbia*, 9 Ben. 254; *The Laura V. Rose*, 28 Fed. Rep. 104; *The Aurania*, 29 Fed. Rep. 98.

I think the evidence sustains the claim on the part of the tug that, from the time the first two whistles were exchanged until she backed, she had starboarded her helm so as to go further to the westward, and thereby aided the Springfield, and did nothing to thwart her. She was proceeding very slowly; backed strong when collision was threatened; and, in my opinion, made no swing to starboard other than the slight change necessarily incident to the backing of a right-handed propeller. This was all she was called upon to do. The libel against her must therefore be dismissed, with costs; and that against the steamer sustained, with a reference to compute the damages.