## THE CANISTEO.

(*District Court, N. D. New York.* October 19, 1891.)

1. COLLISION—TUG AND STEAM-BARGE—DUTY TO STOP.

On a clear, still day, the steam-barge Canisteo was passing down the Niagara river, in the channel between White's island and the main shore, intending to round the foot of the island, and get a tow from its opposite side. As she reached the foot of the island, she sighted the steam-tug Wales, with a tow, about opposite the middle of the island, descending the middle of the main channel, which is here about 2,300 feet wide. The Canisteo signaled that she wished to pass next to the island, to which the Wales assented. As the Canisteo entered the main channel, she put her helm hard a-starboard, but the swift current prevented her from swinging up stream as quickly as she otherwise would have done, and she struck the Wales when about mid-stream, and under considerable headway. *Held,* that it was the Canisteo's duty to know, before giving the signal, that she could make the turn, and, it appearing that after finding she could not make it she might have avoided the collision by reversing her engines, she was clearly in fault.

2. SAME—FAILURE TO GIVE ROOM.

It appearing that the Wales might have avoided the collision without slacking her speed, by putting her helm hard a-starboard, thus giving more room, she too was negligent, and must bear half the damages.

In Admiralty. Collision of steam-barge and tug.

*George S. Potter,* for libelant.

*George Clinton,* for respondents.

COXE, J. On the afternoon of May 14, 1890, off the foot of White's island, on the Niagara river, the steam-barge Canisteo collided with the steam-tug Wales. The Canisteo is about 200 feet long and 33 feet beam. The Wales is 130 feet long and 24 feet beam. The Wales was towing a small lake barge loaded with cedar posts down the river bound for a dock on the inside of White's island. The day was clear and there was little wind. In fact there was nothing abnormal in the condition of the elements to affect the navigation of either vessel. The channel from White's island to the main shore is 700 feet wide. The river channel is 2,300 feet wide, and navigable from bank to bank. Neither vessel drew over 11½ feet. The current of the river is northerly, and runs at the rate of about four miles an hour. The current in the channel between the island and the shore is about two miles an hour. On the day in question the Canisteo was proceeding down the latter channel intending to turn at the foot of White's island and pick up a barge belonging to her tow, which was lying near the center of the island on the outer, or westerly side. As the Canisteo passed the foot of the island the Wales was a little to the west of the center of the river and nearly opposite the middle of the island. The Wales was proceeding at the rate of about six miles per hour, the Canisteo about four miles per hour. In this situation the vessels sighted each other. A little later the Canisteo gave two short blasts on her steam-whistle which meant, "I am directing my course to port," and indicated that she wished to pass the Wales on the starboard side. To this, by a similar signal, the Wales assented. As the Canisteo passed out into the main channel with her helm hard a-starboard the tendency of the swift current was to prevent her swinging to port, or up stream, as fast

as she would do in ordinary circumstances. The Wales and her tow proceeded down the river, and at a point nearly opposite the striped stake the Canisteo struck the Wales about midships on the starboard side. After the collision the Wales made a circle to starboard, and sank in shoal water near the striped stake. The following diagram will serve to illustrate the situation:

The exact locality of the collision is in dispute. The weight of testimony indicates that it took place about opposite the striped stake, and a little to the west of the center of the river. Of the statutory sailing

rules the only ones which seem applicable are articles 18, 21, and 24, Act March 3, 1885, (23 St. at Large, 438.) They are as follows:

"Art. 18. Every steam-ship, when approaching another ship so as to involve risk of collision, shall slacken her speed, or stop and reverse, if necessary."

"Art. 21. In narrow channels every steam-ship shall, when it is safe and practicable, keep to that side of the fair-way or mid-channel which lies on the starboard side of such ship."

"Art. 24. Nothing in these rules shall exonerate any ship, or owner, or master, or crew thereof, from the consequences * * * of the neglect of any precaution which may be required by the ordinary practice of seamen or by the special circumstances of the case."

Article 16 is not applicable, for the reason that the vessels were not crossing at any time, and surely not after the Canisteo had indicated her intention to pass to the left and the Wales had assented to this arrangement. If the course of the Wales had been down the river and that of the Canisteo to a point on Grand island, their courses would have been crossing and the rule would apply. If that were the situation, the Wales, having the Canisteo on her starboard side, should have put her helm to port and passed astern of the Canisteo, while the latter should have continued on her course, or ported if necessary to avoid collision. But it was not the situation. Each vessel knew the other's destination, and each knew that nothing but unskillful seamanship could bring her across the other's course. They were to pass on rounding courses. Their courses were at no time crossing.

This is not a case of inevitable accident. Indeed, it is difficult to imagine such an accident happening in broad daylight, on wide and tranquil waters, to two steamers under way, properly manned and equipped and easily handled. A collision usually implies fault upon the part of one or both of the vessels, and where the above circumstances concur the presumption is strong that it is due to the unskillfulness of both.

*First.* Was the Canisteo at fault? She undertook to change the established rules of the road. If she had followed the usual course, and passed to the right, there could have been no collision. When she signaled for permission to go to the left, it was an assurance to the Wales that she had the ability to make the turn without placing the Wales in jeopardy. Certainly the Wales was not called upon at the outset to anticipate that the Canisteo would run past the center of the river before being able to make the turn. The blow was struck by the Canisteo almost stem on near the center of the river. The libelant's witnesses think the collision was west of the center. The map, which the master of the Canisteo testifies correctly represents the situation, locates the collision nearly in the center. When it is remembered that the Canisteo asked for and received the left-hand side of the river, that after she had encroached upon the Wales's water her bow was still far from heading up stream, that the force of the blow indicated that, even then, she was making considerable headway, it seems impossible to escape the conviction that she was improperly handled. She should have known that

she could make the turn before she gave the signal. When she found that she was not coming around she should have changed her tactics, or signaled for the starboard side. To keep on drifting down stream, and towards the center of the river, with her bow directly towards the course of the tug incumbered with a tow, was the most dangerous of all courses and seemingly inexcusable. The evidence shows several ways in which the Canisteo could have avoided the accident. It is not necessary to consider them in detail; one will be sufficient. After it became evident that she was not swinging to port in a satisfactory manner, and that she was describing a much wider circle to the westward than was compatible with safety, if she had stopped or reversed the accident would have been avoided. Even after the danger of collision was imminent she kept on directly toward the Wales, and it was not until the last moment that the obvious course suggested was adopted. Why was she not stopped? No satisfactory answer is given. The Canisteo was light, she was easily handled, she minded her helm perfectly, and the current of the river would have assisted her in stopping. For this fault alone, if there were no other, she must be held liable.

*Second.* Was the Wales negligent? Regarding this question there is more doubt. She was steaming down stream at the rate of six miles an hour in a swift current. It was necessary to go over four miles an hour in order to make steerage-way. She was towing a loaded barge, making it difficult to stop and reverse or to maneuver successfully. She was in the center of a wide channel, where she had a right to be, and remained in the center, or nearly so, until she was struck. At first it was thought that her course, in view of what she had a right to expect would be the conduct of the Canisteo, was all that prudence required; that she was not called upon to anticipate, and could not anticipate, the erratic course of the latter vessel; but after reading the testimony I am convinced that she might have avoided the accident. When the Wales first sighted the Canisteo she was over half a mile distant, and a little to the west of the center of the river. When the collision occurred she was in the same relative situation—a little to the west of the center. She knew, when the Canisteo put her stem into the swift current of the river, that the tendency would be to swing her bow down stream; she saw that the Canisteo was not making a short turn; that she was not coming up between White's island and the striped stake, but was making a wide *détour* to starboard. It was evident that the Canisteo might need more than half of the river in which to make the turn; this being so, the Wales should have kept out of her way. The libelant recognizes this obligation, and meets it by testimony that the wheel of the Wales was put to starboard and soon afterwards hard a-starboard, though it is not clear at what point the change was made. If the court could credit this testimony the Wales would be exculpated. But it is thought that the witnesses must be mistaken, in view of what afterwards took place. There is a vast discrepancy between what the Wales would have done if she had starboarded, as stated, and what she actually did do. The Wales answered her helm readily. This is undisputed, and her extra-

ordinary exhibition after the blow was struck shows that she was able to make an exceedingly short turn. If her helm was put hard a-starboard soon after the signals were exchanged, how can her position at the time of the collision be accounted for? Surely she would not have remained in the same relative position to the center of the river; she would have been far over towards Grand island. It is said that, hampered by her tow, the Wales could not turn quickly. Even if entirely trustworthy, this testimony would hardly account for her position; she certainly would have made considerable progress towards the Grand island shore. But upon this branch of the case it is thought that the respondents' testimony is more convincing than that of the libelant. It cannot be doubted that a prompt starboard helm would have brought the Wales out of the reach of danger, even though the Canisteo took two-thirds of the river in which to make the turn. The theory is untenable that it was impossible for the Wales after the signals to change her course to port so as to make the accident impossible. The libelant is entitled to one-half the damages and a reference to compute the amount.