---

## THE RUTH.

(District Court, D. Oregon. April 4, 1910.)

### No. 4,985.

1. COLLISION (§ 51*)—NAVIGATION RULES—DUTY OF OVERTAKING VESSEL.

Article 24 of the Inland Navigation Rules (Act June 7, 1897, c. 4, 30 Stat. 101 [U. S. Comp. St. 1901, p. 2883]), which provides that "every vessel overtaking any other shall keep out of the way of the overtaken vessel," requires the overtaking vessel in a stream to give the one ahead such wide berth as to avoid any contingency that might arise from the effect or condition of the currents.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 57–61; Dec. Dig. § 51.*

Collision—overtaking vessels, see note to The Rebecca, 60 C. C. A. 254.]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. SHIPPING (§ 81*)—LIABILITY OF VESSEL FOR TORTS—VIOLATION OF RULES
OF NAVIGATION.

The steamer Ruth was following the steamer Oregona up the Willamette river, and was close behind when the Oregona reached the Clackamas Rapids. The latter was unable to ascend the rapids by her own power, and, after going as near the head as possible, sent men ashore to make fast a steel line for the purpose of pulling her up the remaining distance by means of a capstan. She was unable to hold her position and began to drift down with the current, dragging the line which libelant, one of her crew, was directed to pull in and coil on the deck. As soon as she commenced to drift, she gave danger signals to the Ruth, which had entered the rapids, pushed against the bank, and was holding herself there by her wheel. The Ruth paid no attention to the signals, and her wheel picked up the line as the Oregona drifted by, and it caught libelant, severing both his feet. *Held*, that the Ruth was in fault and liable for the injury in failing as an overtaking vessel to drop down and keep out of the way when signaled; there being evident danger of some accident if she did not.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 344, 345; Dec. Dig. § 81.*]

3. ADMIRALTY (§ 42*)—PARTIES—SUIT AGAINST VESSEL FOR TORT.

Where an injury is due to the fault of two vessels, their liability is not joint, but several, and the injured party may proceed against one alone for the full amount of his damage; it being the privilege of the libeled vessel to bring in the other under admiralty rule 59.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. § 371; Dec. Dig. § 42.*]

4. DAMAGES (§ 132*)—PERSONAL INJURY—LOSS OF BOTH FEET.

An award of $10,000 as pecuniary damages made to a libelant, who was 19 years old and earning $50 per month and board, for an injury by which he lost both feet, and an additional sum of $2,000 for his suffering.

[Ed. Note.—For other cases, see Damages, Cent. Dig. § 382; Dec. Dig. § 132.*]

In Admiralty. Suit by Virgil K. Pollard, by Edward N. Deady, his guardian ad litem, against the steamer Ruth. Decree for libelant.

H. B. Nicholas and Newton McCoy, for libelant.
A. C. Spencer and Ralph Moody, for respondent.

BEAN, District Judge. On the morning of October 15, 1907, the steamers Oregona and Ruth were on a voyage up the Willamette river, from Portland to Oregon City and points above. The libelant was a deckhand on the Oregona. Both boats reached the Clackamas Rapids about the same time; the Oregona being a few boat lengths in advance. The water on that morning was unusually low, and a current variously estimated at from six to ten miles per hour, and setting strongly against the west bank. Neither boat was able to proceed over the rapids, but both were required to use a line and capstan for that purpose. The Oregona steamed up as near the head of the rapids as she could, and put a part of her crew ashore on the west bank with a ⅜″ steel line for the purpose of attaching it to a "dead man" for use in lining over the rapids. About the same time, the Ruth came up below the Oregona within about two boat lengths, or 300 feet, pushed her nose into the west bank, holding herself in position by the movement of her wheel, and put part of her crew ashore with a line pre-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

paratory to attaching it to the "dead man" as soon as the Oregona was over the rapids. The power of the Oregona, however, was not sufficient to hold her against the current until her line could be attached, and she commenced to drift downstream toward the Ruth, notwithstanding the full use of her power. Orders were given to haul in the line and danger signals sounded as a warning to the Ruth that she was drifting. There was, however, no one in the pilot house of the Ruth at the time; the captain having gone below to give orders to the engineer and superintend the splicing of the line. ·The Oregona continued to drift; the libelant and other members of her crew drawing in her line as fast as they could, and coiling it on the deck, the usual, customary, and proper manner of handling the line under the circumstances. The danger signals were repeated, but the Ruth made no effort to move out of the way, nor did she stop the movement of her wheel. The Oregona drifted down alongside the Ruth, when some conversation was had between her captain and that of the Ruth about the latter moving downstream. The captain of the Ruth said he could not do so because his boat was crowded into the bank. The Oregona then dropped down, and about the time, or shortly after, her bow passed the stern of the Ruth, her line, a part of which was still in the water, was picked up by the wheel of the Ruth and rapidly unwound, catching the libelant, who was coiling it on the deck of the Oregona, severing both feet between the knees and the ankles.

There is some conflict in the testimony as to whether the Ruth was moving upstream at the time the line was picked up, or whether it was done by the wheel while the boat was stationary. The great weight of evidence, in my opinion, is to the effect that, as soon as she was clear of the Oregona, the Ruth, which was the more powerful boat, immediately steamed up at full speed in order to get ahead of and over the rapids before the other boat, and thus picked up the line. The witnesses, however, were most of them on board the Oregona at the time, and may have been deceived by the movement of their boat. I do not regard this point, however, as of controlling importance. The Ruth was the following vessel, and it was her duty to take all reasonable means to keep out of the way of the Oregona, when it became evident that the latter was unable to steam the current and was being carried down by it towards her.

Article 24 of Regulations Applicable to Rivers, Harbors, and Inland Waters (Act June 7, 1897, c. 4, 30 Stat. 101 [U. S. Comp. St. 1901, p. 2883]) provides that, notwithstanding anything contained in these rules, every vessel overtaking any other vessel shall keep out of the way of the overtaken vessel. This rule requires the overtaking vessel to give the one ahead such wide berth as to avoid any contingency that might arise from the effect or condition of the currents. The Monarch (D. C.) 30 Fed. 283; Forsyth v. Schooner Brandreth (D. C.) 3 Fed. 414. This the Ruth did not do or attempt to do. It is said that she was entitled to the rights of an anchored vessel, but she was not anchored or fastened to the shore or aground. She was simply holding herself against the current and the bank by her wheel, ready to move at any time. When she saw that the Oregona was being carried down

toward her by the force of the current, and a collision probable, she could easily have gotten out of the way by stopping her wheel and drifting with the current. This she made no effort to do, although repeatedly warned by the danger signals, and must, in the exercise of ordinary care, have known that the Oregona's cable was in the water and liable to be picked up by her wheel if it came in contact therewith. It seems to have been her purpose to retain her place in order that she might get ahead of the other vessel, and, from a careful examination of the testimony, she is, in my opinion, liable for the injury to the libelant.

It is claimed that the evidence shows that the Oregona was also at fault, and therefore the libelant should be required to make her a party, so that the damage may be apportioned between the two vessels in this proceeding. But, as I understand the law, where an injury is due to the fault of two vessels, the liability is not joint, but either is answerable to the injured party for the whole damage sustained by him, and he may proceed against one vessel alone, and, if he did not himself contribute to the disaster, may recover judgment for the full amount of his loss. Day et al. v. H. W. Hills (D. C.) 31 Fed. 727; The Atlas, 93 U. S. 303, 23 L. Ed. 863.

Under Admiralty Rule No. 59, and the practice in admiralty courts, the claimant in a suit for damages by collision may before, or at the time of, answering the libel, or such further time as the court may allow, have process issued against another vessel which he claims to have been at fault, but this duty does not devolve upon the libelant. The Hudson (D. C.) 15 Fed. 162.

The amount to be awarded is difficult to determine. There is no fixed rule by which it can be ascertained. Aside from the question of suffering, the recovery should, of course, be the pecuniary loss sustained by the libelant, and to that, so far as it can be ascertained, it should be confined. The libelant was about 19 years of age at the time, and was earning $50 a month and board. He is practically incapacitated by the accident. In my opinion $10,000 is a fair estimate of the pecuniary loss sustained by him. To this should be added a sum to compensate for the suffering which he endured, and for the character of the injury sustained, which can, I think, be reasonably fixed at $2,000, making a total of $12,000. This seems to be in accordance with the allowance usually made in such cases. Thus in The Buffalo (D. C.) 147 Fed. 304, a laborer, age 22 years, earning $25 a week, was allowed $6,000 for the loss of one arm. In Peterson v. Roessler & Hasslacher Chem. Co. (C. C.) 131 Fed. 156, a laborer age 39 years, earning $1.50 per day, was allowed $8,000 for the loss of both eyes. In The Homer (D. C.) 99 Fed. 795, a carpenter age 30 was allowed $12,000 for permanent injury to his back.