## ATLAS TRANSP. CO. v. LEE LINE STEAMERS.

(Circuit Court of Appeals, Eighth Circuit. August 24, 1916.)

No. 4490.

1. COLLISION ⬥95(5)—OVERTAKING STEAM VESSELS—FAULT.

The steam towboat Josh Cook, with four barges in tow, two ahead, end to end, and one on each side, was passing up the Mississippi river at night, and when in Random Shot Chute, a narrow, crooked, and

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

changeable channel above Memphis, about a mile long, was overtaken by the steamer Rees Lee. The Lee signaled her intention to pass to the port of the Cook, to which the latter assented. When opposite the leading barge the Lee sheered to starboard because unmanageable and from the effect of the current was turned across the channel. The Cook reversed and backed, but the Lee came into collision with the port barge, which shortly afterward sunk. *Held*, that the Lee was in fault for attempting to pass in the dangerous channel; that the action of the Cook in backing, if not proper, was taken in extremis, and not chargeable as a fault.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200-202; Dec. Dig. ⊜95(5).]

2. COLLISION ⊜94—OVERTAKING VESSELS PASSING—ASSUMPTION OF RISK BY OVERTAKING VESSEL.

Under Rule 22 of the navigation rules applicable to the Mississippi River (Rev. St. § 4233 [Comp. St. 1913, § 7964]) which provides that "every vessel overtaking any other vessel shall keep out of the way of the last mentioned vessel" an overtaking vessel is to be its own judge of the matter of safety in passing and assumes all risk, except such as may be due to the fault of the overtaken vessel and the latter by answering a passing signal no more than assents to the passing at the risk of the overtaking vessel.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 197-199; Dec. Dig. ⊜94.]

Appeal from the District Court of the United States for the Eastern District of Missouri; David P. Dyer, Judge.

Suit in admiralty for collision by the Atlas Transportation Company against the Lee Line Steamers. Decree for respondent, and libelant appeals. Reversed.

George A. Mahan, of Hannibal, Mo. (James A. Seddon, of St. Louis, Mo., and Albert R. Smith and Dulany Mahan, both of Hannibal, Mo., on the brief), for appellant.

Guy A. Thompson, of St. Louis, Mo. (O'Neill Ryan, of St. Louis, Mo., on the brief), for appellee.

Before HOOK and CARLAND, Circuit Judges, and MUNGER, District Judge

MUNGER, District Judge. From a decree dismissing a libel in admiralty, the libelant appeals. The suit grew out of a collision between vessels navigating the Mississippi river. The libelant's steam towboat, the Josh Cook, was ascending the river above Memphis, towing four barges, of which two were lashed end to end straight ahead. One was lashed to the starboard side, and one to the port side of the Josh Cook, and each of these lapped back 40 or 50 feet. The one on the port side, called the Barrett, No. 15, was loaded with coal, and it sank after the collision. The Josh Cook was 175 feet long, 34 feet wide, and drew from 5 to 5½ feet of water. Each barge was 28 feet wide and 160 feet long.

The respondent's vessel, which collided with the barge, was a packet stern wheel steel hull steamer, 260 feet long, 50 foot beam, called the Rees Lee. It was a speedier boat than the Josh Cook, and was also bound up the river. It passed the Josh Cook about 11 o'clock at night,

made a landing at Pecan Point Warehouse on the Arkansas side, and while so engaged the Josh Cook passed up the river ahead of the Rees Lee. After having discharged its passengers and freight at Pecan Point Warehouse, the Rees Lee put out from shore and again proceeded up the river. When about 150 feet behind and somewhat to port of the Josh Cook, it blew two blasts of its whistle as a signal that it desired to pass the Josh Cook on the port side, to which the Josh Cook answered with two blasts. At this time the vessels were ascending a channel of the river known as Random Shot Chute. It was about a mile in length, ran slightly north-northwest by south-southeast, and was bordered on the east by a sand bar, the western shore of which curved slightly to the northwest and to the southwest.

Along the inner side of the sand bar was shoal water, covering a submerged portion of the bar. West of the channel, and along the Arkansas shore, and extending well out into the river towards the sand bar, was another reef or submerged sand bar. Its shape somewhat resembled an equilateral triangle, with the Arkansas shore as its base, and the apex reaching out to the channel proper, opposite the center of the shoal along the west side of the eastern sand bar. This left a narrow passage of deep water, whose width was estimated by different witnesses as from 150 to 500 feet.

When the Rees Lee blew its passing signal, the Josh Cook was near the middle of the channel and about to enter the narrowest portion of it, between the point of the western reef and the reef along the west side of the east sand bar. It was about half past 11 at night, with no moon, but clear starlight. The Josh Cook veered somewhat to the east and reduced its speed to slow, and the Rees Lee came alongside and about 50 or 60 feet away under a full head of steam. When the stern wheel of the Rees Lee was about opposite the middle of the head barge, its prow began to turn towards the southeast and the boat was beyond control of its rudder. This was claimed to have been caused by the Rees Lee running at fast speed into shoal water upon the point of the submerged sand bar on the west, and the displaced water on its port bow, being unable to find escape, "piled up" and resisted progress on that side, and caused the boat to run away from the shoal, and this, together with the river current, turned its course across the channel. The pilot of the Josh Cook, seeing the danger, stopped and then backed it, placing it and its barges also across the channel, so that the boats were about parallel, and in this position they remained for a few minutes, and then the starboard bow of the Rees Lee came in contact with the port side of the coal barge, damaging it so that it subsequently sank.

[1] The trial court found that the collision was an accident, without fault of the Rees Lee. For the respondent, the claim is made that the point of the reef had been built up and out into the river unexpectedly, causing shoal water where the Rees Lee attempted to pass the Josh Cook. The witnesses for both parties agreed in testimony that this portion of the river was known to be difficult to navigate, and had a narrow and crooked channel. They also agreed that the channel was subject to sudden changes, and that bars and reefs were formed and

destroyed in periods as short as overnight. The pilot of the Rees Lee admitted that this channel was considered as a mean place and a very changeable one, with a rapid current and a narrow channel. While the pilot had not seen this channel for a week before the collision, the Rees Lee had gone through it on its downward journey on the forenoon of that day. Under these circumstances, the Rees Lee was at fault in undertaking to pass the Josh Cook in the nighttime in such a narrow and changeable channel, bordered by shoal water, when a few minutes' delay would have afforded a safe place for passing.

[2] It is claimed that the Josh Cook was at fault, because it answered the Rees Lee's signal by two blasts of its whistle, and that this was an assurance of the safety of the attempted maneuver, whereas it should have responded with the danger signal. By rule 22 of the rules enacted by Congress for the prevention of collisions, applicable to vessels upon this portion of the Mississippi river:

"Every vessel overtaking any other vessel shall keep out of the way of the last named vessel." Act April 29, 1864, c. 69, art. 17, 13 Stat. 61 (Comp. St. 1913, § 7964).

By rule 8 of the pilot rules for the Mississippi river adopted under authority of sections 4405–4412 of the Revised Statutes of the United States (Comp. St. 1913, §§ 8159–8166):

"When a steamer is overtaking another steamer, * * * if the overtaking steamer shall desire to pass on the left or port side of the steamer ahead, she shall give two short blasts of the whistle, and if the steamer ahead answers with two blasts, the overtaking steamer may pass on the port side of the steamer ahead; or if the steamer ahead does not think it safe for the overtaking steamer to attempt to pass at that point she shall immediately signify the same by giving not less than four short and rapid blasts of the whistle, and under no circumstances shall the overtaking steamer attempt to pass the steamer ahead until such time as they have reached a point where it can be safely done, when the steamer ahead shall signify her willingness by blowing one blast of the whistle for the overtaking steamer to pass on the starboard side of the steamer ahead, or two blasts of the whistle for the overtaking steamer to pass on the port side of the steamer ahead.

"Every steamer overtaking another shall keep out of the way of the overtaken steamer. Every steamer coming up with another steamer from any direction more than two points abaft her beam shall be deemed to be an overtaking steamer. * * *

"The steamer ahead shall in no case attempt to cross the bow or crowd upon the course of the overtaking steamer."

Under these rules, the Josh Cook had the right and the duty to hold her course. It was not its duty to keep away from the Rees Lee, unless a collision should become imminent. The Rees Lee had the right to pass the other boat, if it could do so with safety to both. It had to be its own judge as to the matter of safety, as whatever risk attended its passage from the narrowness of channel, the shallowness of water, the current, suction, or other causes, except the fault of the Josh Cook, was assumed by the Rees Lee. The reply of the Josh Cook to the passing signal of the Rees Lee was no more than an assent to it, at the risk of the vessel proposing it. It expressed an understanding of what the Rees Lee proposed to do, and an agreement not to thwart it; but the success of the maneuver was at the risk of the Rees Lee. Spencer on Collisions, § 71; Whitridge v. Dill, 23 How. 448, 454, 16 L. Ed. 581; The Great Republic, 23 Wall. 20, 32, 23 L. Ed.

55; The Atlantis, 119 Fed. 568, 571, 56 C. C. A. 134; The Mesaba (D. C.) 111 Fed. 215, 221, 223; The Nereus (D. C.) 23 Fed. 448, 455; The Greenpoint (D. C.) 31 Fed. 231, 232; The Charles Morgan (D. C.) 6 Fed. 913, 914; The Canisteo (D. C.) 47 Fed. 908, 910; The Ruth (D. C.) 178 Fed. 749, 751; The Henry W. Oliver (D. C.) 202 Fed. 306, 310; The Fred Jansen, 49 Fed. 254, 255, 1 C. C. A. 238; Standard Oil Co. v. The Garden City (D. C.) 38 Fed. 860, 862; The Aurania and The Republic (D. C.) 29 Fed. 98, 125; The City of Springfield (D. C.) 29 Fed. 923, 925; The Edward Smith, 135 Fed. 32, 36, 67 C. C. A. 506; The Sif (D. C.) 181 Fed. 412, 415.

In behalf of the Rees Lee, it is claimed that the Josh Cook was at fault in not holding its course, in placing itself and its barges diagonally across the channel after the Rees Lee had sounded the danger signal, and in not beaching the barge Barrett, No. 15, in shallow water that was immediately on the right and left of the scene of the injury. The witnesses agree that, as soon as the passing signal had been given, the Josh Cook yielded some of the channel to the passing boat, by taking a course slightly further east than the one it had pursued and was entitled to hold.

There is a conflict in the testimony as to whether the course of the Josh Cook was changed at the time the Rees Lee began to veer to the southeast. To some of the witnesses on the Rees Lee, it appeared as if the Josh Cook had veered to the north and west, and the theory is advanced that it had encountered shoal water on the east side of the channel, and had turned from it into the deeper water to the west, so that the boats appeared to be running somewhat toward each other. If this be accepted as the fact, it cannot be said that the Josh Cook was bound to anticipate that the Rees Lee would be so managed that it would run across or down the channel and escape control. It is but speculation with unknown factors to say that the Rees Lee could have safely righted itself in the current, had the Josh Cook maintained its course. Moreover, the shifting of its passageway so as to give a wider berth to the Rees Lee was known to the Rees Lee when it undertook to pass.

It is said the Josh Cook was negligent because it stopped its engine and began to back when the danger signal was given, and this caused the prow of the Josh Cook and its barges to be carried by the current down stream, so that the Rees Lee was unable to swing about in the current without its wheel striking them, and therefore it was compelled to drift in a parallel position across the channel until the collision. The charge is also made that the barge should have been beached upon some of the nearby sand bars, instead of attempting to land it upon the head of the sand bar to the east, an attempt that resulted in failure, owing to the barge breaking in two from the weight of its cargo, after the forward end had been pushed on the bar.

Of these charges, it is enough to say that the time in which the officers had to act was short, the dangers imminent, and the results uncertain. If the acts of officers of the Josh Cook were mistakes, they were made in extremis, and pardonable. The Elizabeth Jones, 112 U. S. 514, 526, 5 Sup. Ct. 468, 28 L. Ed. 812; The Maggie J. Smith, 123 U. S. 349, 355, 8 Sup. Ct. 159, 31 L. Ed. 175.

It appears evident that the responsibility for the collision rested solely upon the Rees Lee, and the decree of the lower court is reversed, with costs in both courts, and the cause is remanded, with directions to enter a decree holding the Rees Lee solely at fault, and to order a reference therein to ascertain the damages.