## THE PLEIADES.

## LUCKENBACH S. S. CO., Inc., v. UNITED STATES.

(District Court, S. D. New York. May 7, 1925.)

**1. Collision ⬅98—Overtaking steamer held solely at fault.**

Under Inland Rules, arts. 21, 24 (Comp. St. §§ 7895, 7898), and pilot rule No. 10, steamer overtaking another at Horseshoe Bend on Delaware river *held* solely at fault in failing to signal desire to pass or giving warning of presence, and in coming so close that, when overtaken vessel suddenly sheered because of tide, collision resulted.

**2. Collision ⬅94—Vessel, consenting to have overtaking vessel pass, must hold her course and speed.**

Under Inland Rules, art. 21 (Comp. St. § 7895), where overtaking vessel notifies vessel

ahead that she wishes to pass and receives consent, overtaken vessel must then hold her course and speed.

**3. Collision ⬦⟹94—Overtaking vessel solely at fault in approaching so close as to cause collision, when tide or current causes overtaken vessel to sheer.**

Under Inland Rules, arts. 21, 24 (Comp. St. §§ 7895, 7898), vessel *held* in fault for following another in narrow channel at such proximity and speed that, when tide or current caused vessel ahead to suddenly sheer, overtaking vessel embarrassed navigation of ship ahead and collided with her.

**4. Collision ⬦⟹126—Damages for collision held to include injuries from stranding.**

Damages recoverable for collision caused solely by fault of overtaking vessel includes injuries from stranding directly after collision.

In Admiralty. Libel by the United States against the steamship Pleiades, the Luckenbach Steamship Company, Inc., claimant, wherein claimant filed cross-libel. Libel dismissed, and decree entered in favor of cross-libelant.

Carter, Carter & Phillips (by Peter S. Carter and Robert Phillips), of New York City, for Luckenbach S. S. Co., Inc.

Emory R. Buckner, U. S. Atty. (by Horace M. Gray, Sp. Asst. U. S. Atty.), of New York City, for the United States.

GODDARD, District Judge. These are cross-suits to recover damages alleged to have been sustained as a result of a collision which occurred between the steamship Pleiades and the steamship Lake Delancey on the Delaware river at Horseshoe Bend shortly after 1 p. m. on May 21, 1920. The Pleiades, loaded with a cargo of coal, left Port Richmond piers, Philadelphia, at 11:50 a. m. bound for Rotterdam. As she was proceeding down the river, about an hour later, she passed the Lake Delancey, also with cargo, backing out from the Greenwich coal piers into the stream with the assistance of two tugs. When the Lake Delancey straightened out, the Pleiades was about a quarter of a mile ahead and proceeding at her full speed of about 7 knots. The Lake Delancey then proceeded at her full speed, which was between 8 and 10 knots.

The Pleiades was 331.5 feet long, 47 feet beam, and drawing 24.6 feet on an even keel. The Delancey was 251 feet long, 43.5 feet beam, and was drawing 20 feet forward and 22.6 feet aft. Both ships were in charge of licensed Delaware river pilots. When the Pleiades reached Horseshoe Bend, which is a strip of water a little less than a mile in width, with a dredged channel about 900 feet wide, curving through it, which channel is marked at intervals with buoys, the Delancey was following the Pleiades at a distance variously estimated to be from 200 to 900 feet astern, and 2 or 3 points on her port quarter. Upon reaching the vicinity of Horseshoe buoy, the Pleiades ported her helm in order to make the turn to the starboard, but, instead of taking the bend, she took a sudden sheer to port. Her pilot then, with the intention of preventing her from stranding on the Jersey side of the river, towards which the sheer was causing her to go, set her engine room telegraph at "full speed astern," and then blew danger signals.

In the meantime the Delancey had continued to overtake the Pleiades, and by so doing had reached a position so close to the Pleiades that there was imminent danger of the Pleiades being struck on the port side amidships by the Delancey, as that was the point on the Pleiades for which the Delancey was headed. The pilot of the Pleiades therefore immediately put the engine room telegraph "at full speed ahead," in order to prevent being struck amidships and possibly sunk by the Delancey. The Delancey, continuing ahead, struck the Pleiades a glancing blow on the port quarter, and shortly thereafter the Pleiades stranded on the Jersey shore, from which she was later floated by tugs. Surveys were subsequently held, which showed that the Pleiades was not only damaged by the impact of the collision, but by the stranding.

It was broad daylight. The weather was clear, with a light wind. There was a strong flood tide running, and at the turn, where the collision occurred, it sets from Horseshoe Bend towards the New Jersey side of the channel. It is admitted that, to make the turn to the starboard at Horseshoe Bend, the Pleiades put her helm hard to port; further, that her steering gear functioned properly, and that her rudder was moved to the full extent of its travel to starboard under the hard-aport helm. It appears from all the evidence that the Pleiades did not at any time actually move astern, for the order "full speed astern" was immediately followed by "full speed ahead," and the only effect of the full speed astern was the partial stopping of her headway.

The witnesses do not agree as to the speed at which the ships were proceeding, or the distance at which the Delancey was following the Pleiades when the sheer occurred, the testimony varying from 200 to 1,000 feet; but it is admitted that the proximity of the ships was such that the pilot of the Delan-

cey shouted to the pilot on the Pleiades to go ahead, instead of going astern, so as to avoid, if possible, being struck by the Delancey. I find that the more reliable testimony and the circumstances lead to the conclusion that the Delancey was overtaking the Pleiades just before the sheer occurred, and that, when the Pleiades sheered, the order for full speed astern was given by her pilot, followed within a few seconds by a warning signal.

The fault charged against the Delancey is that she was an overtaking vessel, proceeding at too great a rate of speed, and that she was allowed to come so close to the Pleiades that, when the Pleiades sheered, the Delancey was unable to stop or avoid running into her; the charge of fault against the Pleiades is that her sheer was caused by a too close proximity to the starboard side of the channel and delay in the sounding of her danger signal.

Whether the Delancey was following behind the Pleiades at a distance of 200 or 1,000 feet, or the exact number of knots she was making, does not seem to me particularly important, if her nearness to the Pleiades and her rate of speed were such that she could not avoid a collision with the Pleiades in the event that the Pleiades sheered or altered her course. Even if there was a failure on the part of the Pleiades to give a warning of her change of course, that would not, it seems to me, free the Delancey from fault, because she should have had a lookout observing the Pleiades; but I do not find that the Pleiades was remiss in giving warning signals. The testimony as to what caused the sheer is not positive, but I think it can be said, with reasonable certainty, to have been the force of the tide against the starboard bow of the Pleiades as she attempted to round the bend, and possibly aided by the tide against her port quarter as it sets from the Jersey shore, as explained in Knight's Modern Seamanship (7th Ed.) p. 427. It is admitted that her steering gear was in good working order. The testimony as to the handling of the wheel eliminates this as the cause.

Pilot rule No. 10 provides:

"In narrow channels each steam vessel shall, when it is safe and practicable, keep to that side of the fairway or midchannel which lies on the starboard side of said vessel."

Article 24 of the Inland Rules provides (Act June 7, 1897, c. 4 [Comp. St. § 7898]):

"Notwithstanding anything contained in these rules every vessel, overtaking any other, shall keep out of the way of the over-taken vessel. Every vessel coming up with another vessel from any direction more than two points abaft her beam, that is, in such a position, with reference to the vessel which she is overtaking, that at night she would be unable to see either of that vessel's side lights, shall be deemed to be an overtaking vessel; and no subsequent alteration of the bearing between the two vessels shall make the overtaking vessel a crossing vessel within the meaning of these rules, or relieve her of the duty of keeping clear of the overtaken vessel until she is finally past and clear.

"As by day the overtaking vessel cannot always know with certainty whether she is forward of or abaft this direction from the other vessel, she should, if in doubt, assume that she is an overtaking vessel and keep out of the way."

In The M. J. Rudolph (C. C. A.) 292 F. 740, where a steam lighter overtook and collided with a tug, Circuit Judge Rogers states (at page 742):

"If the overtaking vessel comes so close to an overtaken vessel that a sudden change of course by the latter may bring about a collision the fault is that of the overtaking vessel. She should not come so close without a signal. As this court held in The Merrill C. Hart, 188 F. 49, 51, 110 C. C. A. 187, 189: 'The overtaken vessel is not required to look behind before she changes her course, however abruptly.' And the rule which requires a signal from the overtaking vessel and assent from the other is intended, as we said in that case, to avoid just what, on the Rudolph's theory, happened on this occasion."

And on page 743:

"But as he was going up the river, and observed the boats that were coming down the river, he was not under obligations to observe what boats were approaching him from the rear. It was the duty of all such boats to keep away from him. * * * But he was under no obligations to warn a vessel coming up behind him, and which had not given him notice of her presence, that he was going to make the maneuver; and from what has already been said in this opinion it appears that it is not the duty of an overtaken vessel to look behind, or to give warning to a vessel behind her, and which has not herself given warning of her presence, before she changes her course, however abruptly."

In The Merrill C. Hart, 188 F. 49, 110 C. C. A. 187, where it is claimed that collision occurred when a tug suddenly changed her course and was struck by a steamboat which

was following, Circuit Judge Lacombe, says on page 51 (110 C. C. A. 189):

"Manifestly, however, she approached so close to the vessel she supposed she was overtaking that a sudden change of course by the latter would bring about a collision. But she should not have come so close to an overtaken vessel without signal. The overtaken vessel is not required to look behind before she changes her course, however abruptly."

[1] In the present case the Delancey had not requested permission to pass the Pleiades, and no consent had been given. The Delancey had not given warning of her presence, although the Pleiades had observed her and knew that she was following her, but the Delancey had placed no restrictions upon the Pleiades' maneuvering. If the Pleiades was keeping so close to the starboard side of the channel as to catch the strong tide on her bow and cause her to sheer, the Delancey was in a position to observe what was happening, and should not have come so close to the Pleiades as to crowd her, and to prevent her from maneuvering so as to avoid getting into difficulties.

[2] The rule is clear that, where an overtaking vessel notifies the vessel ahead that she wishes to pass and receives in reply that vessel's consent, the overtaken vessel must then hold her course and speed. Article 21, Inland Rules, supra (Comp. St. § 7895); Spencer v. The Dalles, P. & A. Navigation Co., 188 F. 865, 110 C. C. A. 499. Even though there had been no exchange of signals or permission to pass, it is quite true that the overtaken vessel might maneuver with such palpable negligence as to be inexcusable, but here the sheer was caused by the tide. "The precautions against danger of necessity, in any case, rest to a greater extent upon the boat in the rear than upon the boat in advance, and this is imminently true of a large and fast steamer following a small and slow boat." The Great Republic, 90 U. S. (23 Wall.) 32, 23 L. Ed. 55.

In The City of Baltimore, 282 F. 490, 492, Circuit Judge Waddill, speaking for the court, states:

"She was an overtaking vessel, charged specifically with the duty of securing the assent of the other vessel before attempting to pass, and at the same time with the duty of keeping clear and out of the way of the overtaken vessel. * * * The Baltimore was not only neglectful of her duty and clearly at fault in the respects mentioned, but she was proceeding at a rate of speed that should have admonished her not to approach too closely the overtaken vessel."

In Robinson v. Detroit & C. Steam Nav. Co. and Hurley et al. v. City of Mackinaw, 73 F. 883, at page 889, 20 C. C. A. 86, 92, Circuit Judge Taft, speaking for the Circuit Court, says:

"But, if he did not choose to signal and establish an agreement with the Majestic, it was certainly the duty of the captain of the Mackinaw to take every reasonable precaution to keep out of the way of the vessel ahead."

In The Ed B. Smith, 135 F. 32, at page 38, 67 C. C. A. 506, 512, Circuit Judge Lurton stated:

"Thus, if the Massaba by her own wrongful conduct placed the Smith in a position of immediate and extreme danger, she would not be held to blame if she did something wrong in her endeavor to extricate herself, and should not be held to have contributed to her own danger."

In Long Island Railroad Co. et al. v. Killien, 67 F. 365, at page 367, 14 C. C. A. 418, 420, Circuit Judge Wallace, speaking for the Circuit Court, said:

"As an overtaking vessel, it was the duty of the Garden City to keep out of the way of the tug; and in this behalf it was incumbent upon her, when shaping her course to pass the tug, to allow a sufficient margin for safety, taking into consideration all the incidents of the situation; among them, the tendency of the cross-current to deflect the course of the tug. * * * He was perfectly familiar with the tides and currents around the Hook. * * * He undoubtedly knew what reasonable allowance ought to be made for the influence of the cross-current upon the course of the tug, and the dictates of ordinary prudence enjoined upon him the necessity of making such allowance. * * *"

In The Osceola (D. C.) 30 F. 383, affirmed (C. C.) 35 F. 559, where the O., a steamboat, overtaking the S., collided with her, and, on suit brought, defended by alleging a sheer on the part of the S., but the evidence showed that she had approached dangerously near the S. without giving the signal required by the rules. Judge Benedict stated:

"If, as the libelants contend, the Spray made no sheer, the liability of the Osceola is clear. If, on the other hand, the Spray did sheer, still the Osceola was in fault, for she was the overtaking vessel, and approached dangerously near to the Spray without giving the signals required by the inspectors' rules. Had the signal been given, or had it been proved that the Spray had been other-

wise informed of the position of the Osceola, the Spray would have been in fault for changing her course when she did, but, in the absence of such signal or such knowledge, her change was not a fault."

In The Hackensack (D. C.) 32 F. 800, Judge Benedict stated:

"Testimony in this case has satisfied me that the cause of this collision was the approach of the Hackensack to the Dumont ahead of her so near that, when the Dumont, in order to allow a vessel to pass, stopped her engine and reversed, the Hackensack had not time to avoid collision, although she promptly stopped her engine and ported her wheel. The proof is that the tide was strong flood, and that, as soon as the Dumont stopped and reversed her engine, the Hackensack stopped and hove her wheel hardaport, but in spite of those efforts she ran into the Dumont. This shows the Hackensack to have been in dangerous proximity to the Dumont. To be so near the vessel ahead in that place was a fault, and the fault that caused the collision. There was no fault on the part of the Dumont. She made no sternway but simply stopped and reversed her engine. When she did this she had the right to presume that in that place and tide no vessel would be so near her from behind as to strike her stern without backward movement on her part."

Mr. Justice Clifford in Whitridge v. Dill, 23 How. 448, at page 454 (16 L. Ed. 581), quotes the following as a long-recognized rule:

"A ship going out of a port last," says Emerigon, "is to take care to avoid the vessel that has gone out before her." Emerigon, c. 12, § 14, p. 330. And Valin says (section 2, p. 578): "Whether it be by night or day, the ship that leaves after another, and follows her, should take care to avoid a collision, without which she will have to answer in damages."

[3] As I understand the rule, and it is a rule calculated to prevent collisions, a ship is at fault if it follows another in a narrow channel at such proximity and speed that when the tide or current causes the ship ahead to suddenly sheer, the following ship embarrasses the navigation of the ship ahead and runs into her. Atlas Transportation Co. v. Lee Line Steamers, 235 F. 492, 149 C. C. A. 38; Killien v. Hyde (D. C.) 63 F. 172; The Governor, Fed. Cas. No. 5,645; The Rhode Island, Fed. Cas. No. 11,745; The Sicilian Prince, 144 F. 951, 75 C. C. A. 677; The Fleetwing (D. C.) 114 F. 409.

[4] From the above, it appears that there was no fault on the part of the Pleiades, and accordingly the libel against the Pleiades is dismissed, and a decree may be entered in favor of the Pleiades against the Delancey for the damages sustained as a result of the collision, which include the injuries from her stranding directly after the collision, with the usual references to ascertain the amount of damages.