## Petition of TEXAS CO.

## THE ALL AMERICAN.

United States District Court
S. D. New York.
July 11, 1951.

Pyne, Lynch & Smith, New York City (Anthony V. Lynch, Jr., New York City, of counsel), for petitioner.

Irving H. Saypol, U. S. Atty., New York City (Kirlin, Campbell & Keating, Eugene F. Gilligan and Gilbert S. Fleischer, all of New York City, of counsel), for respondent.

COXE, District Judge.

This is a proceeding brought by the Texas Company, as owner of the steam tug All American, for exoneration from, or limitation of liability for, the damages resulting from a collision on the morning of February 3, 1946, between the steam-

ship Jagger Seam, owned by the United States, and the drawbridge of the Central Railroad Company of New Jersey spanning the Hackensack River at Kearny, New Jersey. In the proceeding a substantial claim was made on behalf of the Central Railroad of New Jersey for damage to the bridge, and this claim has been settled, and paid by the United States, under an arrangement with the Texas Company that the payment was without prejudice as between the Jagger Seam and the tug All American. There is also a claim by the United States for damage to the Jagger Seam. It has been stipulated by the parties that in the event the tug All American is held liable, it is entitled to limitation of liability.

The All American is a tug about 95.6 ft. long, 23.5 ft. beam; she was bound down the river with an empty oil barge, the Texaco 402, in tow, made fast to her port side. The barge was about 210 ft. long and about 44 ft. beam. The Jagger Seam, also bound down the river, is a single-screw Liberty type vessel converted to a collier, about 2500 horsepower, 422.8 ft. long, 57 ft. beam, 6643 gross tonnage, 3740 net tonnage, and having a high superstructure—all aft and about 35 feet above the water. She was light, having water ballast only. Her draft was about 11 ft. 6 inches forward and 17 ft. 6 inches aft. Two tugs were in attendance, but neither one had any lines to the vessel.

The Hackensack River runs in a general southerly direction, with many curves. There are several bridges across the river, the last two, as one goes downstream, being the Lincoln Highway bridge and the Central Railroad of New Jersey bridge, the latter of which is a full half-mile below the Lincoln bridge. The Lincoln bridge is a double leaf Bascule type of bridge, i. e., it has two leaves, each of which is raised to open a draw of 150 feet in width between them. The Central bridge rests upon a center pier, and swings to open a draw passage of 94-1/2 feet on each side of the pier. The Lincoln bridge is at a right angle to the channel, while the Central bridge is at a slight angle.

The channel is about 300 feet wide; it runs straight and at a right angle from the center of the draw in the Lincoln bridge to the center pier of the Central bridge; it then turns slightly to the west and broadens out. A mile or so farther downstream the Passaic River runs into the Hackensack. Adjoining the west end of the Central bridge and above the bridge, and to the west of the channel, are the Federal Shipyards at Kearny, where vessels 600 feet long, with a tonnage of 22,000 tons, were launched during the war. The depth of the water in front of the shipyards, for at least 700 feet along the river, is about the same as that in the channel.

The All American left Little Ferry, New Jersey, which is a considerable distance up the river, at about 9:00 AM on February 3, 1946, with the empty oil barge in tow, and proceeded downstream; at about 10:35 she passed the Jagger Seam, as the latter was undocking at the Koppers Coal dock on the west side of the river. After undocking, the Jagger Seam followed down the river. The weather was clear, with a strong northwest wind of about 35 miles an hour. The tide was ebb, with a force of from 1-1/2 to 2 miles an hour.

The All American was proceeding at full speed of from 6 to 6-1/2 miles an hour. After leaving the Koppers dock, the Jagger Seam proceeded at various speeds until 10:51 AM. She then proceeded at full speed from 10:51 to 10:55; at half speed from 10:55 to 11:05, and at full speed until 11:05-1/2. The collision occurred at 11:06. Full speed for the Jagger Seam, under the then prevailing conditions, was about 12 knots an hour through the water; half speed was about 6-1/2 or 7 knots an hour through the water.

Both vessels were about in the center of the channel, and both were holding up a little to the wind. The rudder and propeller of the Jagger Seam were about 2 feet out of the water; nevertheless, she handled well at the speed at which she was proceeding. When the Jagger Seam was passing through, or was a little above, the draw in the Lincoln bridge, and the All

American was about halfway from the Lincoln bridge to the Central bridge, the Jagger Seam blew a signal of two blasts. When this signal was not answered, the Jagger Seam blew a danger signal, followed by two blasts, which the All American answered with two blasts, indicating that the Jagger Seam intended to pass to the left of the All American and through the left or east draw of the Central bridge. Sawyer, the pilot of the All American, testified that in his opinion this could be done safely.

The All American was heading for the west draw. She then slowed down to one bell, stopped her engines, and drifted for a few seconds, to shape up the tow to go through the west draw. The All American was never stopped dead at any time, nor did she change her course.

When the Jagger Seam saw that the All American appeared to have stopped, the Jagger Seam blew a danger signal, followed by a single blast, indicating that she was going to change her course to the right in order to pass through the right or west draw of the Central bridge. This the All American answered with a single blast. The All American at that time was about 200 or 300 feet above the Central bridge, and the Jagger Seam was not more than 700 or 800 feet behind the All American.

After the exchange of these one-blast signals, the All American proceeded full ahead with a hard left rudder, and then, after clearing the center pier of the bridge, with a hard right rudder; she passed safely through the left or east draw, except for a slight rubbing of the barge against the crib on the left side of the draw. The Jagger Seam proceeded at full speed ahead with a hard right rudder, clearing the center pier of the bridge, and then, with a hard left rudder in order to pass through the right or west draw, but as she did not come around fast enough she went full speed astern and dropped an anchor. Her stem struck the bridge west of the west draw, causing damage to the Jagger Seam and to the bridge. At no time did the Jagger Seam call upon her two tugs for assistance, although they were following immediately behind her.

It is clear that the blame for this collision rests solely upon those who were in charge of the navigation of the Jagger Seam. She was an overtaking vessel in a narrow channel. Under Articles 23, 24 and 21 of the Inland Rules, 33 U.S.C.A. §§ 208, 209 and 206, she was required to keep out of the way of the All American and her tow, and, if necessary, to slacken her speed, stop or reverse, and the All American was required to keep her course and speed.

Although the Jagger Seam sought for, and obtained, permission from the All American to pass her to port, which the pilot of the All American thought could be done safely, the Jagger Seam still remained under the duty of navigating prudently and assumed all the risks of such navigation. The permission given merely expressed an understanding on the part of the All American of what the Jagger Seam proposed to do, and an agreement by the All American to do nothing to thwart it. Atlas Transp. Co. v. Lee Line Steamers, 8 Cir., 235 F. 492, 495. It was not an agreement by the All American to assist in the maneuver; at most, it was an agreement by the All American to hold her course and speed, so far as practicable, to do nothing to thwart the Jagger Seam, and that she knew of no circumstances, not also open to the observation of the Jagger Seam, which would prevent the latter from safely passing, if prudently navigated. Charles Warner Co. v. Independent Pier Co., 278 U.S. 85, 89, 49 S.Ct. 45, 73 L.Ed. 195; The Cedarhurst, 2 Cir., 42 F.2d 139, 142, certiorari denied 282 U.S. 868, 51 S. Ct. 75, 75 L.Ed. 767. See The Industry, 2 Cir., 29 F.2d 29, certiorari denied New York & New Jersey Steamboat Co. v. Schomburg, 279 U.S. 837, 49 S.Ct. 251, 73 L.Ed. 985.

When, thereafter, the Jagger Seam concluded that she could not safely pass on the left, and blew a one-blast signal, indicating that she now desired to pass on the right and go through the west draw in the Central bridge, and the signal was answered by

the All American with a single blast, a new passing agreement was made. But both vessels were then so near to the Central bridge that both had to maneuver skillfully in order to get through the draws. The All American succeeded in doing so, but the Jagger Seam was so close to the bridge that, at the high speed at which she was proceeding, with the strong ebb tide, she could not do so, and the collision occurred. The Jagger Seam did not attempt to slacken her speed, or stop or reverse, until less than a minute before the collision; nor did she ever call upon her two tugs, which should have been preceding instead of following her, to assist her.

The opinion of Fiddy, her master, that if she had gone astern and dropped her anchor when the engines of the All American appeared to be stopped, she would probably have collided, despite the strong northwest wind, with some naval craft that were tied up at the Federal Shipyards to the west, hardly deserves consideration. The collision appears to have resulted solely from the Jagger Seam's desire and insistence upon passing through the Central bridge before the All American.

There may be a decree in accordance with this opinion exonerating the Texas Company from liability.