## THE CITY OF BALTIMORE.

### (District Court, D. Maryland. September 22, 1921.)

### No. 720.

1. **Collision ⬅️102—Overtaking and overtaken vessel held both at fault.**

    Where a steamer collided with a tug while attempting a starboard passage from the rear after signaling for a port passage, both vessels *held* at fault; the steamer, even though the tug turned to port after assenting to the port passage and thence to starboard as the steamer, signaling for a starboard passage, veered in that direction, in failing to put her engines full speed astern, and attempting a starboard passing without having first secured the tug's assent, and the tug, with the steamer so near and either directly astern or a trifle on her starboard quarter, in assenting to a port passing.

2. **Collision ⬅️14—Blunder, though excusable, no defense, if master without license.**

    Though a tug's error in agreeing to a port passing by a steamer too near astern was in extremis, and the situation, in which cool judgment was difficult, was not created by her, such facts are no defense where her master had no license as required by law, since, if the man in charge blunders and does not have the legally required evidence of competency, it is insufficient that he had all needful skill or that his lack of it made no difference.

In Admiralty. Libel by the Baker-Whitely Coal Company against the steamer City of Baltimore, arising from a collision with the tug Britannia. Both ships held at fault.

H. N. Abercrombie, of Baltimore, Md., for libelant.

Floyd Hughes, of Norfolk, Va., and George Weems Williams, of Baltimore, Md., for respondent.

ROSE, District Judge. The collision with which we are concerned cost two lives and not a little money. Admittedly it was inexcusable; the only possible controversy being as to which of the vessels involved

was free from blame, if either was. They were the passenger and freight steamer, City of Baltimore, hereinafter for brevity styled the Baltimore, and the tug Britannia. The former is 310 feet long, and of upwards of 2,300 tons burthen. The latter was one-third of the other's length, and one-fifteenth of its tonnage. They came together somewhere between 6:50 and 6:55 on the evening of October 7, 1920, in the Ft. McHenry Channel in the vicinity of Buoy 18; that is, about 3,500 or 3,600 feet beyond the Lazaretto Light, at the entrance to the inner harbor of Baltimore. The steamer's stem struck the starboard quarter of the tug, and pushed her so far over that she never righted. Water poured over her side, and she sank so quickly that two of her crew were drowned. The tug was moving at the rate of 8 to 9 knots an hour. The steamer had followed her down the harbor and the Ft. McHenry Channel, and just before the collision was gaining upon her with increasing rapidity. The Baltimore for some time had had the tug in sight, but not until very shortly before the disaster was the Britannia aware of her approach. The steamer wanted to pass the tug, and gave a two-blast signal. It was unheard and unanswered. It was repeated with a like negative result. A third attempt drew from the tug the assenting two blasts.

So far the facts are satisfactorily established, although witnesses on each side, as well as some who are apparently disinterested, do not agree as to them. The evidence is unusually contradictory, even for a collision case. Many of those who testify are mistaken and confused not only as to time and distance, but as to the order of events and the number and character of the signals sounded. The account sworn to before the steamboat inspectors was not always the version testified to in court. Some of the comparatively numerous witnesses who were not of the company of either ship speak as to matters which are important, if true, but all or nearly all who do so are demonstrably in error as to other things. Doubtless everything happened within so brief a compass of time that observation and recollection were alike hopelessly blurred.

Both ships had agreed that the steamer should pass to the port of the tug, but nevertheless her stem struck the tug's starboard quarter. Why she was on that side is the vital issue in the case. She says that when she received the tug's assent she went a quarter of a point to port, but that simultaneously the tug made a sharp turn of six or seven points in the same direction, and in consequence went clear across her bow. Her master explains that he supposed the tug was bound for the Canton piers, to the north and east of the channel, and was cutting across the steamer's course to get to them. He thereupon threw the Baltimore's head to starboard, and blew the corresponding one blast. No sooner had he done so than the tug again started across his bow, this time from port to starboard. He promptly put his engines full speed astern. It was too late. The collision followed instantly. That the steamer immediately before the disaster went to starboard is admitted by the tug, and is said to have been the cause of the accident, but the Britannia strenuously denies going to port at any time after it knew that the

Baltimore was in the neighborhood. Those on the tug claim that the only change of course she made was a movement to starboard to facilitate the steamer's port passing. The Britannia was not bound for the Canton piers. Her destination was Curtis Bay, to reach which she would have kept to the channel for some time longer, and would then have gone out of it to starboard. Yet, unless the steamer saw or thought she saw that the Britannia was turning to the left, there was no reason why she should have gone to the right.

The weather was clear; neither wind nor tide counted for anything. All that was out of the ordinary was the presence in the channel of the British steamship Peterton. She had dropped anchor in the anchorage grounds to the south and west of the channel, but had swung into it. If some of the witnesses on each side are accurate in their statements, she occupied two-thirds or more of its 600 feet of width, for, according to them, she left less than 200 feet clear. It appears probable that she did take up about a half of it, perhaps more, possibly less, but there was plenty of passing room left. The collision took place at a point about 600 feet beyond or down channel from her. At the speed the tug was making, it must have occurred in a trifle over 40 seconds after she got by the anchored vessel.

[1] In passing judgment upon the legal consequences of the tug's actions, it must be borne in mind that until she was aware of the Baltimore's proximity she was free to move in whatever direction her convenience dictated. It is therefore important to fix accurately in relation to the third two-blast signal the time at which the Britannia went to port, as within not much, if at all, exceeding 3 minutes before the collision she must have done at least once. The line of the Ft. McHenry Channel is sufficiently to the eastward of that followed by vessels coming down the harbor to require them to turn to port when outward bound. The tug was ahead, and must therefore, in getting from one channel to the other, have crossed the steamer's course from right to left. When the Baltimore subsequently made the like change, the tug would appear to one on the steamer's deck to be returning from port to starboard.

How far, if at all, some of the witnesses may have had these ordinary and necessary movements in memory does not appear. Some of them say that from their position on the Baltimore's forward deck they saw the red light of the tug as she went across their steamer's bow. Within the fixed limits of time and distance then existing, that was physically impossible. It is, however, not difficult to comprehend how they may have fallen into error. On the eastward side of the channel there is a red gas buoy. As the tug went to port, and before on her journey down channel she came opposite this buoy, it might to one on the Baltimore's deck have come in range along the Britannia's side and have been mistaken for her red light. The movement of the tug to the left, observed by those on the Baltimore, who also claim to have seen her red light, must therefore have been before she reached the gas buoy, that is to say, before she went by the Peterton's stern, for the position of that stationary ship is satisfactorily established as one in which the gas

buoy was directly astern of her or possibly a little off her starboard quarter. The Peterton's witnesses speak of a port movement of the tug apparently around that steamship's stern, although they differ as to whether the position of their vessel required the tug to go in that direction. None of them noticed any subsequent swing of the Britannia to the left, and I do not think there was one. The porting of which the Peterton's people speak must have been made not more than a minute before the collision. The inquiry, then, is whether the tug heard and answered the Baltimore before or after she passed the British ship.

The evidence from the deck of the last named is that the Britannia was well by their ship before the Baltimore blew her third two-blast signal, and that, when the Britannia answered, the steamer herself had altogether passed. If that be true, and I think it is, the bow of the Baltimore had, when she received the tug's assent, already gotten within less than 300 feet of the point of collision, which, upon that assumption, took place within 15 seconds thereafter. She must, moreover, have been not much, if any, over 100 feet from the tug's stern. Thereafter neither time nor space were seemingly sufficient for the tug to have gone completely across the steamer's bow from starboard to port, so that she was from 20 to 50 feet off the Baltimore's starboard bow, and then to have almost completed a second crossing in the opposite direction. The preponderance of disinterested evidence from those so placed as to be best qualified to speak with accuracy as well as the probabilities resulting from an analysis of the time and space available require it to be found as a fact that the tug's movement to port was before, and not after, she agreed to the steamer's port passing, and may not be charged to her as fault.

How, if so much be held established, are the Baltimore's subsequent actions to be accounted for? Here, too, it is necessary to keep in mind with what rapidity events followed each other.

The master of the Baltimore says he blew his first two-blast signal when he was abreast the Lazaretto—that is, a trifle less than three minutes before the collision—but his mate on watch at the time says it was not sounded until they were outside that point. The way in which the witnesses from the Peterton speak of these signals strongly suggests that the first of them was not given until the Baltimore had gotten considerably further down channel. The three two-blast signals must have followed very quickly one upon another to produce the impression upon the master of the Florida, to which reference will presently be made. It is quite possible that a minute will cover the time which passed after the giving of the first signal and before the collision, and two will almost certainly do it.

The Baltimore's master does not impress one as likely readily to give way, or, without reluctance, to change his own plans. As with haste, and it may be with irritation as well, he gave one signal after another without getting a response, he may have failed to note or to appreciate that the tug was going to port, or he may have supposed that she was doing so merely the more safely to get by the Peterton, and

would, so soon as she had passed that vessel, resume her former position in the channel. At the moment he blew his last two blasts he may not have registered in his mind how little time was left in which anything could be done, but before the answer came he may have realized how perilous the situation had become. A port passing may have appeared impossible. The instant which it may have taken for him to detect the starboard movement of the tug may have been that in which he decided to go himself to starboard, and to give the one-blast signal, telling the tug what he was doing. The tug had no time to answer, much less to co-operate in this latest proposal.

Much thought and as careful an analysis of all the evidence as I am capable of making leads me to believe that the true story of what happened has been above given. It is in conflict with what some of the witnesses, as well for the tug as against her, say. For example, the Britannia's people all claim that when they looked back after hearing the third two-blast signal they saw the Baltimore's green, but not her red, light. That was what all of them who were any distance forward of her stern would have seen immediately before the collision. They may realize that it questionable whether the tug should have assented to a port passing by a rapidly moving ship already close to her starboard quarter. There is in this case that which leads one to fear that not much weight can be given to a good deal of the testimony as well on one side as upon the other. It is unnecessary to speculate how many inaccuracies are intentional, if indeed any are. The speed with which everything was crowded together and the unconscious bias of witnesses account for much. The impression already stated as to what happened is the only one I have been able to reconcile with such facts as seem to me to be established. Accepting it as sound, in what legal position does it put the two vessels? The fault of the Baltimore is clear, as I think it would be even if the Britannia's movement to the left was not begun until after she had assented to a port passing. The steamer had been getting closer and closer to her. So far as those on the Baltimore could judge, she had not heard any signals, and they must have understood why she had not. Almost every witness who was not on the tug has something to say about the noise her exhaust was making. The Baltimore's captain must have appreciated how difficult it would be for any one in her pilot house to hear anything coming from astern. Still the steamer came rushing on, diminishing by some 400 feet a minute the distance between them. Was she justified in so doing?

The experienced master of the Florida, a vessel of not dissimilar size and speed, and which was following the Baltimore, stopped his ship when he heard the third two-blast signal. He could not see the tug. He did not know to whom or to what the Baltimore was attempting to signal, but he felt that, when it had been necessary in quick succession thrice to sound two blasts, caution was required of every one in the vicinity. The Baltimore's master says that the tug was far enough to starboard to make it apparently safe for him to keep on, but that was necessarily upon the assumption that the Britannia, who knew nothing of his whereabouts, would maintain her course. Usually

a following vessel which takes such chances must pay the penalty. Assuming without deciding that under the conditions as he claims they were he was not required to slacken speed until and unless the tug had refused permission to pass, he is nevertheless, upon his own version of the facts, in fault for what he did and refrained from doing after the tug had answered, and, in spite of her assent to his request, had gone to port as he says she did. His guess that for some reason of her own she had undertaken to cut across his bows might be correct, but it was also possible that she wanted to do what in effect she had promised she would, and that her turn to port was due to some momentary failure of either steering gear or human element to function as it should, and that she would at once seek to correct her error by returning to starboard. Under such circumstances, he should have taken no chances. There were at possible peril too many lives on the Baltimore, to say nothing of those on the tug. Her engines should at once have been put full speed astern. If this had been done at the time the one-blast signal was given, and her head thrown to starboard, it is certainly possible, if not probable, that there would have been no collision. He had no right to attempt a starboard passing without having first secured the tug's assent to it. On any reasonable theory of the facts, her own as well as those of others, the Baltimore must be held in fault.

How is it with the tug? Upon the steamer's version of the facts, the Britannia blundered, but, even if the accident happened, as it has already been found that it probably did, would she be free from blame? If the Baltimore was not more than 100 feet away, and either directly astern or a trifle on the tug's starboard quarter, the latter should not have assented to a port passing. She appreciated that the situation was one of peril, and that unusually quick action was required if the passing was to be made in safety. She threw herself so sharply to starboard that the resulting list to port frightened one of her crew, at the time below, and sent him hurrying on deck in alarm, although he must, in the every day work of the tug, have been used to sharp and sudden changes of direction.

[2] It may be argued that, if the Britannia was wrong in agreeing to a port passing, her error was in extremis, and that she had had no part in creating a situation well calculated to make cool judgment difficult. For this contention much may be said, but, unfortunately for her, she was at the time under the command of a man who had no master's license. As she was of upwards of 150 tons, she was being navigated in flat defiance of law. Some months later he obtained his master's certificate. It is quite possible that he would have acted as he did even had he then possessed that particular scrap of paper. But if the man in charge blunders, no matter how easy the mistake may have been, and he does not have the legally required evidence of competency, it will seldom, if ever, do to say that even so it was possible that he had all needful skill or that his lack of it made no difference.

Both ships were in fault. If an agreement as to the amount of damage done cannot be reached, the advocates will be further heard.