## THE VARANGER v. THE DORA WEEMS.

## WESTFAL–LARSEN & CO. v. BALTIMORE & CAROLINA LINE, Inc.

No. 1738.

District Court, D. Maryland.

Nov. 24, 1930.

Brune, Parker, Carey & Gans, of Baltimore, Md. (W. Ainsworth Parker and James B. Diggs, both of Baltimore, Md.), for libelant and cross-respondent.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (by Ira Campbell and J. H. Turnure, both of New York City), and Janney, Ober, Slingluff & Williams, of Baltimore, Md. (by Robert Stinson, of Baltimore, Md.), for respondents and cross-libelant.

WILLIAM C. COLEMAN, District Judge.

The question presented for decision is as to the liability for a collision which occurred on August 23, 1929, in the Neches river, a few miles below the city of Beaumont in the state of Texas, between the Norwegian steamship Varanger, owned by libelant, and the American steamship Dora Weems, owned by the cross-libelant. Substantial injury was caused each vessel. On behalf of the Dora Weems $12,000 damages is claimed, and $10,000 on behalf of the Varanger.

The Dora Weems is a single screw, lake type tramp steamer, 261 feet long, 43 foot beam, of 2,316 gross tons, draft 13 feet, 3 inches forward and 16 feet, 8 inches aft. The Varanger is a twin screw tank steamship, 489 feet long, 60 feet, 2 inches beam, of 19,000 gross tons, and draft 27 feet forward, 27 feet 9 inches aft. The Neches river, between Beaumont and Sabine Lake, Tex., is a narrow, tortuous stream of approximately eighteen miles. At the time of the collision, both vessels had passed a bend in the river known as Floyd's Bayou and had straightened out in the reach between that bayou and Shelley Bayou, this section of the river being approximately a mile in length and from 600 to 800 feet wide, comparatively straight, with a natural channel varying from 250 to 300 feet wide and from 18 to 20 feet deep, dredged to a depth of 30 feet, abrupt on the western or right-hand side going downstream, but shelving on the eastern or left hand side, with a bottom width of 150 feet. The Varanger, under her own steam, but assisted by two tugs, was bound out to sea from Beaumont with a cargo of gasoline. The Dora Weems, with part cargo, had left Beaumont also bound down the river on a voyage to Lake Charles, La.

The following additional facts are either uncontradicted or established by a decided preponderance of the evidence. The Dora Weems had left her berth at 5:30 a. m. The weather was clear, practically no wind, and tide flood. About 5:55 a. m., the Dora Weems sighted the Varanger ahead and gradually overhauled her until about 6:30 a. m., when she was about 1,000 feet behind her, whereupon the Dora Weems reduced her speed and for some twenty minutes followed astern, awaiting opportunity to pass the Varanger. Having rounded the bend at Floyd's Bayou, the Dora Weems sounded the port to port passing signal of two blasts which the Varanger promptly answered with two blasts, thereby agreeing that the Dora Weems might overtake and pass her on her port side, and maintained her speed at three knots. The Dora Weems then increased her speed from four or five knots to full speed ahead, which was seven knots, put her helm to starboard, and shaped her course in order to pass the Varanger on the latter's port side. This was at 6:50 a. m. Five minutes later the collision occurred. As to what took place in those five minutes there is much conflict in the evidence. Summarized, the contentions on behalf of the respective vessels are as follows: For the Varanger it is contended that she, being the overtaken vessel, had a right to maintain her course down the middle of the channel, and that the fact that she assented to the passing of the Dora Weems did not make her liable for the risks of the maneuver, and did not require her to facilitate the maneuver by changing either her course or speed, but that as a matter of fact, she did move over to starboard; that is, towards the west edge of the channel as far as she safely could. On behalf of the Dora Weems it is contended that it was the duty of the Varanger either to refuse passage or, having assented, to co-operate with the Dora Weems to such extent as might be necessary in order to assure a safe passing, but that the Varanger failed in this duty, in that (1) she failed to move over as far as possible on her starboard or west side of the channel, in order to allow the Dora Weems to pass without "smelling" the bank on her own port side, as it is claimed the Dora Weems did; and (2)

that she not only failed to stop but failed to reduce her speed, either one of which she was required to do in order to guard against the possibility of her suction affecting the Dora Weems, which it is claimed occurred.

The exact point of collision was just below black buoy S–39 which marks the west side of the channel, a similar red buoy S–40 being opposite and marking the east side of the channel, the distance between these two buoys being approximately 300 feet, and the total width of the river at this point being something less than twice this width. When the vessels collided, the starboard side of the Dora Weems at the break of the forecastle head struck the port side of the Varanger approximately abreast of her funnel, which is aft of amidships. The engines of the Dora Weems were kept full speed ahead and her helm hard astarboard, so that she moved forward along the Varanger's port side and eventually cleared her, the Varanger having backed full on her port engine in order to throw her stern away when the Dora Weems sheered toward her. The tug that had been towing the Varanger on her port side cast off her line, and the Varanger sheered to starboard until her bow came in contact with the starboard river bank.

The Pilot Rules applicable to the present controversy are rules 21, 22, 23, and 24 of the so-called Western Rules (33 USCA §§ 346–349), and are as follows:

"Rule Twenty-one. Every steam-vessel, when approaching another vessel, so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse; and every steam-vessel shall, when in a fog, go at a moderate speed.

"Rule Twenty-two. Every vessel overtaking any other vessel shall keep out of the way of the last-mentioned vessel.

"Rule Twenty-three. Where, by Rules seventeen, nineteen, twenty, and twenty-two, one of two vessels shall keep out of the way, the other shall keep her course, subject to the qualifications of Rule twenty-four.

"Rule Twenty-four. In construing and obeying these rules, due regard must be had to all dangers of navigation, and to any special circumstances which may exist in any particular case rendering a departure from them necessary in order to avoid immediate danger."

■■ In cases of this kind, discarding the theory that the collision was accidental, which is neither claimed nor justified on the evidence, there are obviously two other possible theories upon which the cause of the collision may be predicated: (1) That either one of the vessels was solely negligent, or (2) that both were guilty in some degree of negligence which contributed to the collision. Furthermore, although the overtaking vessel in situations of this kind is the burdened vessel, and although assent to being passed is not tantamount to an assurance by the overtaken vessel of the safety of the attempted manoeuvre, Warner Co. v. Pier Co., 278 U. S. 85, 49 S. Ct. 45, 73 L. Ed. 195, nevertheless the overtaken vessel has a duty of her own to perform in the first instance which is a condition precedent to her being absolved from liability, which duty is that she must not acquiesce in a desire on the part of the overtaking vessel to pass if her (the overtaken vessel's) pilot or master actually knows, or has reasonable cause to believe, that such passing is fraught with positive danger to either or both vessels. The City of Baltimore (C. C. A.) 282 F. 490; Id. (D. C.) 275 F. 490.

The Varanger having agreed to allow the Dora Weems to pass, it becomes necessary to determine, by applying the rule just stated, whether this assent under the circumstances was reasonable and proper. If it was not, then we need not be concerned with attempting to balance and determine the weight of the credible evidence respecting the most disputed part of the testimony, namely, that relating to what course the Varanger was maintaining at the time she permitted the Dora Weems to pass. That is to say, if the passing at this point in the river was unsafe, by reason of suction due to the relative narrowness of the channel and the size and facility of handling either or both vessels, and if the pilot of the Varanger was chargeable with knowledge of this fact, then even though he may have otherwise met all of the requirements of prudent navigation, the Varanger would be responsible at least in part for the collision, because of her contributory negligence.

Let us therefore consider the situation of the Varanger at the time she was signaled by the Dora Weems. She was proceeding under her own steam, but being a large vessel, heavily laden, and there being many sharp bends in the river, she was accompanied by two tugs towing her on 60 foot hawsers from her port and starboard bow. She was 489 feet long, had a beam of over 60 feet and drew 27 feet, which necessitated her keeping in the dredged channel, which at this point is practically straight. She was running at a speed of about three knots. The Dora Weems was a much smaller vessel, with a beam of only 43

feet and a maximum draft of less than 17 feet, so she was not required to keep within the dredged channel. The combined beams of both vessels were 103 feet, which means that if we take the lowest estimate of the width of the *entire* channel, namely, 250 feet, there was left a margin of approximately 150 feet, and prima facie, it would seem that this was adequate for a safe passing of two vessels provided they were prudently navigated. Neither the flood tide nor the wind were of such force as to be a material factor in the navigation. However, whether it was in fact safe for these particular vessels, at this particular time and place, to pass each other, is not to be determined merely by mathematical calculations of the lay mind, unfamiliar with the problem of navigation in its application to this particular waterway, but due consideration must be given to what the testimony of those possessing this technical knowledge, and charged with the navigation of those vessels, discloses.

Unfortunately, the testimony of the pilot of the Dora Weems is not before us, because he was indefinitely incapacitated by serious illness from testifying. We have, however, the testimony of the pilot, Shepherd, of the Varanger. While the court did not have the opportunity of hearing the testimony of this witness in open court, because taken by deposition, and of determining, first hand, its credibility, nevertheless, in the absence of definite showing that his testimony is not trustworthy, or is contradicted by other witnesses entitled to more credence, the court must give full force and effect to this witness' statements. This is especially true since it is not to be assumed that a libelant is entitled to a decree for damages in a case of this kind if in fact its principal witness or witnesses repudiate the basic theory upon which libelant's claim rests. Such would seem to be the situation in the present case. Pilot Shepherd had been licensed to conduct vessels up and down this river for fifteen years, and therefore it must be assumed he had reasonable familiarity with the difficulties and dangers involved in such navigation. Of course, ignorance of the governing pilot rules and his obligations thereunder would be no excuse. He gave as his reason for the collision, suction upon the Dora Weems from the bank on her port side; that is, the east bank, which was shelving. When asked whether, from his experience, he considered it safe or dangerous for one ship to pass another at this point in the Neches river, he replied, "It is always dangerous but it can be done all right." Again, on cross-examination, he stated that he considered it safe for the Dora Weems to pass at this point, but subsequently, when asked "what precautions are ordinarily taken by the ships in these waters when one is overtaking another?" he replied, "To stay behind." And again when asked, "Do you think the safe thing to do in this waterway is not to pass?" he said, "Not for one vessel to overtake another," and when reminded of the fact that he had previously stated that it was safe for vessels to pass, he reiterated, "It is dangerous at all times, but it can be done." Thereupon when asked why, with this knowledge of the danger, he had not refused to allow the Dora Weems to pass, he replied that he had made an exception in the present case because the Dora Weems "was so close to me when he blowed to pass that there was nothing for him to do but go on by." Finally, when asked again whether it was "unsafe to pass, for one ship to overtake another in this channel," he replied, "It is not safe at no time."

While obviously the aforegoing testimony, because of its contradictions, requires careful scrutiny, it nevertheless is the best evidence before the court bearing upon the dangers of navigation at this particular point in the river. Taken as a whole, it indicates that this pilot knew from his long experience, and so stated, that at this point it was unsafe for two vessels to pass in this manner; but having acted contrary to his own better judgment, he attempted to avoid responsibility by stating that he was forced to permit the passing because the Dora Weems gave him no opportunity to do otherwise, being, as he testified, "right at my stern," when she blew to pass. But this part of his testimony is clearly contradicted by the weight of the evidence, since although the master of the Varanger testified that he heard no whistles at all and her chief officer said he heard only one whistle blow, and was not sure which one it was, this testimony cannot be accepted in the face of the testimony of the master of the Dora Weems, to the effect that the Varanger was three ships' lengths (not less than 800 feet) distant when he gave the passing signal, and in the face of similar testimony of the chief officer of the Dora Weems and of the master of one of the Varanger's tugs to the effect that at least 1,000 feet separated the two vessels at that time.

The testimony of Pilot Shepherd that it was never safe to pass at this point is confirmed by the master and chief officer of the Varanger, as well as by the master of one of the Varanger's tugs. All three said this sec-

tion of the river was too narrow for passing. In fact, the only person testifying for the Varanger who claimed that it was a safe place for passing was this vessel's third officer.

The aforegoing conclusion is reached quite independently of the testimony of Hudgins, the master of the Dora Weems, as to the existence of a local custom requiring special navigation on the part of the overtaken vessel, namely, requiring such vessel to move to starboard and stop, or to refuse passage, because it appeared on the cross-examination of this witness that, as a matter of fact, he had never overtaken or been overtaken by another vessel while navigating the Neches river, nor had he seen one vessel overtake another there, his statements being based entirely on hearsay. Obviously, therefore, such testimony is entitled to little, if any, weight.

Summarized, our conclusion with respect to the action of the Varanger is that her pilot was negligent in acquiescing in the Dora Weems' passing signal, and that in so doing he directly contributed towards subjecting the Dora Weems to the force of double suction, that is, the suction from the shelving east bank of the river, and the suction from the Varanger as well. He is chargeable with knowledge that these forces would in all likelihood come into play, as they did, by reason of the characteristics of the river at this point and the positions and movements of the two vessels. Whether the Varanger could or should have moved further towards the western edge of the channel, or should have stopped entirely when assenting to the passing, and whether if either or both of these things had been done the passing might have been accomplished with safety, it is unnecessary to consider, in view of the conclusion which we reach to the effect that, by the overwhelming testimony of the pilot and all but one of the other officers on board the Varanger, it was bad navigation to assent to a passing at this point under any conditions. River and harbor pilots are chargeable with a high standard of skill and care in navigation. Even though their services as pilots be compulsory upon the vessel, their negligence is nevertheless imputed to the vessel. Harrison v. Hughes (C. C. A.) 125 F. 860 and cases cited. See also The Dora Allison (D. C.) 213 F. 645. To say that it was solely the miscalculation of the Dora Weems' pilot as to how close he might safely go to the east bank—because he and not the pilot of the Varanger knew the draught of the Dora Weems, and at what speed he might pass—

which caused the collision, is to ignore the initial negligence of the Varanger's pilot in assenting to the passing. As was said in The Aureole (C. C. A.) 113 F. 224, at page 230: "That such a force [suction] can be created, under the circumstances which we think probably existed in this case, seems to have been generally, if not universally, recognized among those experienced in the navigation of ships in the shallow waters of rivers and bays, and has been accepted as sufficiently proved in a number of adjudicated cases. The strength of this force undoubtedly will differ according to the locality, and is largely affected by the depth of water and the width of the channel through which the ships are passing. It seems to be established that this power or influence called suction is much greater and more dangerous when one vessel is passing another going in the same direction than when they are going in opposite directions. The Alexander Folsom, 3 C. C. A. 165, 52 F. 403; The City of Cleveland (D. C.) 56 F. 729. In the latter case the court says: 'The suction of two vessels passing each other in different directions is not very powerful. It is too short to have any particular effect upon the action of the two vessels unless one is much larger than the other; whereas, if they are going in the same direction, and passing near each other, it has a more powerful effect to deflect the weaker vessel from her course.' The General William McCandless, 6 Ben. 223, 226, Fed. Cas. No. 5,321; The Mariel (D. C.) 32 F. 103."

The question of the liability of the Dora Weems remains to be considered. It was the duty of both vessels to avoid the collision if possible. A vessel which accepts an unwise signal does not thereby excuse the other vessel from fault if the dangerous manoeuvre results in an accident. From the conclusion which the court reaches it is impossible to exonerate the Dora Weems from liability because her pilot, just as the pilot of the Varanger, was chargeable with peculiar knowledge of the river and the inherent danger in attempting to pass at this particular place. In short, it was negligent for him both to seek permission to pass and to act upon such permission when given. This is especially true since, as we have seen, the Dora Weems approached this maneuver as the burdened vessel. In this connection, it is also especially significant to note that her master testified that he did not find his vessel in an emergency but could have stopped and remained astern; and also that the Dora Weems' chief officer testified that when she began to overlap the Varanger and before

any untoward circumstances had developed, she was as close as 20 feet to the Varanger; that is to say, when everything seemed to be going well, the maneuver left very little room to spare. Furthermore, the Dora Weems, by increasing, instead of slackening her speed, failed to conform to rule 21. It has been suggested that she also violated rule 10, which provides that, "Whenever possible, the [passing] signals shall be given and answered before the steamers have arrived at a distance of half a mile of each other." However, because of the nature of the Neches river we are not willing to say that this rule became applicable under the given circumstances.

None of the cases to which the court has been referred appear to be controlling of the present situation because the facts in all of these cases are so distinctly different. Such cases as Southern Pacific Co. v. Haglund, 277 U. S. 304, 48 S. Ct. 510, 72 L. Ed. 892; Warner Co. v. Pier Co., supra, and Atlas Transportation Co. v. Lee Line Steamers (C. C. A.) 235 F. 492; Id. (C. C. A.) 238 F. 349, a decision approved by the Supreme Court in both of the aforegoing cases, had to do with situations where those in charge of the overtaken vessel neither knew, nor were chargeable with knowledge, that the contemplated passing was inherently dangerous. See also The Cedarhurst (C. C. A.) 42 F. (2d) 139, 1930 A. M. C. 1148. For example, in the Southern Pacific Co. Case the court said, at page 310 of 277 U. S., 48 S. Ct. 510, 511: "The Relief [the overtaken vessel], being in a position to fully carry out its agreement, was under no obligation to decline the passing signal because of the approach of the Union on the other side and to sound instead a warning signal. There was nothing in the situation to indicate that the approach of the Union would prevent the Thoroughfare from passing safely, if, as the Relief had the right to assume, it were navigated with due care." So also, in Warner Co. Case, the court said, at page 89 of 278 U. S., 49 S. Ct. 45: "At most the Taurus obligated herself to hold her course and speed so far as practicable, to do nothing to thwart the overtaking vessel, and she knew of no circumstances not open to the observation of the Gulftrade which would prevent the latter from going safely by, if prudently navigated. Of course, no ship must ever lead another into a trap. There was ample room for the Gulftrade to pass. But, if not, she should have slowed down and kept at a safe distance. Her fault was the direct and sole cause of the collision." Again, in the Atlas Transportation Co. Case we find in the opinion of the Circuit Court of Appeals on petition for rehearing, the statement, at page 349 of 238 F.: "The testimony is convincing that the place was safe for passing, if the Rees Lee had passed slowly." In The Cedarhurst, the court said, 42 F.(2d) 139, 142, 1930 A. M. C. page 1153: "There was plenty of water on the starboard side of the Cedarhurst within which the Trojan might navigate, but, in spite of this, she crowded down on the Cedarhurst, either because of persistence in running on her usual set course irrespective of what was ahead, or because, through mere carelessness, she chose to pass nearer the Cedarhurst than was prudent."

It is important to bear in mind always the vital distinction between mere difficulty and actual danger. No master or pilot, whether he be in charge of a favored or burdened vessel, has a right to acquiesce in a maneuver which he knows is inherently so dangerous that it is not likely to be accomplished with safety to both vessels. He may acquiesce, however, if the maneuver can, in his judgment, be accomplished with safety to both vessels although to do so will require an unusually high degree of skill. In the present case everything indicated to both pilots that safe navigation forbid passing at this point. There was no reason why the Dora Weems might not have further postponed the passing. The river a short distance below becomes very much less tortuous and wider. As for the Varanger, the evidence is overwhelming to the effect that to have refused to acquiesce in passing would have resulted in no danger to either vessel. Because of the view which we take, it becomes unnecessary to discuss the difference between the obligations of an overtaken vessel under the Western Rules and under the Inland Rules.

The fault of both vessels being clear and inexcusable, and contributing directly to the collision, damages will be divided between them; the amount to be determined at a subsequent hearing.