PAN AMERICAN PETROLEUM &
TRANSPORT COMPANY,
Appellant,

v.

THE STEELORE, her engines, boilers,
etc., and Ore Steamship Corpora-
tion, Appellees.

No. 6909.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 12, 1955.

Decided March 28, 1955.

William A. Grimes, Baltimore, Md.
(Ober, Williams, Grimes & Stinson, and
Southgate L. Morison, Baltimore, Md., on
brief), for appellant.

George W. P. Whip, Baltimore, Md. (Lord, Whip & Coughlan, Baltimore, Md., on brief), for appellees.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This is an appeal from an interlocutory decree of the United States District Court for the District of Maryland, 123 F.Supp. 346, holding the steamship Pan Virginia solely at fault for a collision occurring on May 10, 1952, between the Pan Virginia and the Steamship Steelore. It was accordingly decreed that the Ore Steamship Corporation, as the owner of the Steelore, was entitled to recover the damages sustained by the Steelore. The cross-libel of the Pan American Petroleum & Transport Company against the Steelore and the Ore Steamship Corporation on account of the damages suffered by the Pan Virginia was dismissed.

We think the collision between these two vessels was primarily due to the fault of the Pan Virginia, the overtaking vessel. The only question we need discuss is whether the Steelore violated Rule VIII of Article 18 of the Inland Rules. If there was such a violation, the two vessels would be mutually at fault and the damages would be equally divided between the Pan Virginia and the Steelore. For, if the Steelore violated this rule, the major and minor fault doctrine cannot be applied. As Judge Soper, speaking for our Court in The Varanger, 4 Cir., 50 F.2d 724, 727, stated:

"When the overtaken vessel, believing that the maneuver is dangerous, nevertheless assents to it, she becomes a participant and is at least jointly liable for a subsequent disaster unless she can show that her assent could not possibly have contributed to the result."

Rule VIII of Article 18 of the Inland Rules, 33 U.S.C.A. § 203, which is applicable here, reads as follows:

"When steam vessels are running in the same direction, and the vessel which is astern shall desire to pass on the right or starboard hand of the vessel ahead, she shall give one short blast of the steam whistle, as a signal of such desire, and if the vessel ahead answers with one blast, she shall direct her course to starboard; or if she shall desire to pass on the left or port side of the vessel ahead, she shall give two short blasts of the steam whistle as a signal of such desire, and if the vessel ahead answers with two blasts, shall direct her course to port; *or if the vessel ahead does not think it safe for the vessel astern to attempt to pass at that point, she shall immediately signify the same by giving several short and rapid blasts of the steam whistle, not less than four,* and under no circumstances shall the vessel astern attempt to pass the vessel ahead until such time as they have reached a point where it can be safely done, when said vessel ahead shall signify her willingness by blowing the proper signals. The vessel ahead shall in no case attempt to cross the bow or crowd upon the course of the passing vessel." (Italics added.)

The Pan Virginia here contends that a violation of this rule occurred, since, it is alleged, the Steelore assented to a passage by the Pan Virginia, the following vessel, at a time when the Steelore believed such passage to be inherently dangerous.

The Pan Virginia is a T–2 type tanker, 520 feet long with a beam of 68 feet and was inward bound to Baltimore with a full cargo. Her mean draft was approximately 30 feet. The Steelore is an ore carrying vessel, 572 feet in length and 72 feet in breadth. She also was inward bound to Baltimore, fully loaded with a cargo of iron ore, with a mean draft of approximately 35 feet.

The collision between the Pan Virginia and the Steelore occurred in the Cut-Off Channel, which is 600 feet wide, with a depth of 39 feet. The Pan Virginia was passing the Steelore, after the Pan Virginia gave a one-blast signal, indicating a desire to pass the Steelore on the

Steelore's starboard side, to which the Steelore gave an assenting signal of one blast.

After the Pan Virginia's bow passed the stern of the Steelore, the Steelore's stern swung to the left and her bow to the right. The port bow of the Pan Virginia struck the starboard side of the Steelore, about 400 feet aft of the Steelore's bow. The quarters of the two vessels rubbed together as the Pan Virginia proceeded by the Steelore, resulting in considerable damage to both vessels.

The Captain of the Steelore testified that there was no inherent danger in passing in the channel and that he did not see any reason why a passing was not safe. On cross-examination, he admitted that he and the pilot had had a conversation about passing in the Cut-Off Channel. The pilot, according to the Captain's testimony, said he did not believe that the Pan Virginia would pass before the angle of the channel was reached. The Captain testified that he did not tell the pilot it was risky to pass here, because he, the Captain, was out on the wing of the bridge at that time, watching the buoys. The Captain admitted, however, that he may have asked the pilot if he thought it was risky to pass here.

Thomas J. Brady, second mate of the Steelore, testified on cross-examination that he was acting as an observer on the bridge of the Steelore at the time of the giving of the signal to pass and that the Captain said: "This is a pretty close passing here. It could be done further up very easily." The pilot answered: "Yes. That is where it will be done." The second mate further testified that the pilot also said: "Nobody but a fool would pass in the straight-away." The Captain in his testimony stated that he did not hear the pilot make such statement. The second mate further testified that the Captain also stated that "She (the Pan Virginia) will drop back, because she cannot pass here."

Captain Dunn and Captain Moodie each testified that he had been in command at various times of the Bethore, a companion ship of the same size and ownership as the Steelore. Each of them said that in his opinion it was not inherently dangerous for an overtaking vessel to pass such a ship in the channel and that on a number of occasions, when in command of the Bethore, he had given consent to such a passing and it had been safely accomplished.

The second mate of the Steelore stated on cross-examination that he believed that passing in the channel was quite safe if done at a reasonable speed. He stated that he thought high-speed passing should be prohibited in the channel. He admitted, however, that he made the following statement at a Coast Guard inquiry prior to this suit: "I think it should be prohibited passing in the channel in the same direction. It is bad enough in the opposite direction. Then there should be a law that speed should be reduced to a minimum when you pass."

Thursby, the pilot of the Steelore, testified before the Coast Guard that it was not normal to pass in the channel and that he assumed that the Pan Virginia wished to pass in the upper channel. He was not concerned about any passage in the Cut-Off Channel because he did not think that any passage would take place there. Captain Morris of the Pan Virginia stated in his deposition that he did not see anything inherently dangerous about passing in the Cut-Off Channel.

■ On this testimony, we cannot say that the finding of the District Judge that the Steelore did not violate Rule VIII was clearly erroneous. And this is true in spite of the fact, as has just been indicated, that those on the Steelore did make somewhat inconsistent statements as to their feelings about a passage in the Cut-Off Channel.

Counsel for the Pan Virginia rely heavily upon the case of The Varanger, 50 F.2d 724. That case is easily distinguishable from the instant case on the facts as was clearly pointed out by Judge Coleman (who also decided the instant case) in his opinion in the District Court,

45 F.2d 608, and also by Judge Soper, speaking for our Court on appeal. For example, in The Varanger case, there were "many sharp bends in the river"; The Varanger was "accompanied by two tugs towing her on 60 foot hawsers"; and "the lowest estimate of the width of the *entire* channel" was 250 feet. 45 F. 2d at pages 610–611. In that case Judge Soper pointed out that "the passing of the vessel at the point of collision was necessarily attended by danger". [50 F. 2d 725.] He distinguished the decision of the Supreme Court in the Charles Warner Co. v. Independent Pier Co. (Charles Warner Co. v. The Gulftrade), 278 U.S. 85, 49 S.Ct. 45, 73 L.Ed. 195, which seems controlling here. In that case, a steamship, desiring to pass scows towed by a tug which she had followed on a flood tide up the Delaware River, gave a passing signal which was assented to by the tug. In attempting to pass she collided with the scows which had been swung across the course of the steamship by the momentum imparted by the tide in the Delaware. It was held that the tug by assenting to the passing did not assume responsibility for the maneuver and that the fault lay entirely with the steamship as she should have anticipated the effect of the tide and kept out of the way. The Court said:

"We cannot conclude that the Taurus was in fault. She was prudently navigated in plain view of the Gulftrade who knew the relevant facts; and by assenting that the latter might pass she certainly did not assume responsibility for the maneuver. At most the Taurus obligated herself to hold her course and speed so far as practicable, to do nothing to thwart the overtaking vessel, and she knew of no circumstances not open to the observation of the Gulftrade which would prevent the latter from going safely by, if prudently navigated. Of course, no ship must ever lead another into a trap. There was ample room for the Gulftrade to pass. But, if not, she should have slowed down and kept at a safe distance. Her fault was the direct and sole cause of the collision."

The Court cited with approval the following passage of the opinion in the Southern Pac. Co. v. Haglund, 277 U.S. 304, 310, 48 S.Ct. 510, 511, 72 L.Ed. 892, saying:

"The Relief was not at fault in accepting the passing signal of the Thoroughfare. This was merely an assent to the proposed passage in the rear of the Enterprise, expressing an understanding of what the Thoroughfare proposed to do and an agreement not to endanger or thwart it by permitting an interfering change in the position of the Enterprise. See Atlas Transp. Co. v. Lee Line Steamers, 8 Cir., 235 F. 492, 495. And the Relief, being in a position to fully carry out its agreement, was under no obligation to decline the passing signal because of the approach of the Union on the other side and to sound instead a warning signal. There was nothing in the situation to indicate that the approach of the Union would prevent the Thoroughfare from passing safely, if, as the Relief had the right to assume, it were navigated with due care."

The Court in the Gulftrade also cited with approval Atlas Transportation Co. v. Lee Line Steamers, 8 Cir., 235 F. 492, and quoted the following from the opinion in that case:

" 'The reply of the Josh Cook to the passing signal of the Rees Lee was no more than an assent to it, at the risk of the vessel proposing it. It expressed an understanding of what the Rees Lee proposed to do, and an agreement not to thwart it; but the success of the maneuver was at the risk of the Rees Lee.' "

The full quotation with the citation of a large number of cases is in 235 F. 495, as follows:

"The Rees Lee had the right to pass the other boat, if it could do so with safety to both. It had to be

its own judge as to the matter of safety, as whatever risk attended its passage from the narrowness of channel, the shallowness of water, the current, suction, or other causes, except the fault of the Josh Cook, was assumed by the Rees Lee. The reply of the Josh Cook to the passing signal of the Rees Lee was no more than an assent to it, at the risk of the vessel proposing it. It expressed an understanding of what the Rees Lee proposed to do, and an agreement not to thwart it; but the success of the maneuver was at the risk of the Rees Lee."

From the opinion of the District Judge below, we quote:

"We find no ground for holding, as has been contended on behalf of the Pan Virginia, that if she is found to have been at fault, it was nevertheless a case of mutual fault, and that both vessels must be held liable. As already stated, it was not inherently dangerous for the Pan Virginia to pass the Steelore in this particular part of the channel. Therefore, the Steelore was not at fault in assenting to the passing. It was the excessive speed of the Pan Virginia, and the fact that in trying to pass, she kept much too close to the Steelore, that alone constituted the fault. The channel was sufficiently wide to enable her to keep as much as 250 to 300 feet away from the Steelore in passing. If she had done so, there is nothing to indicate that suction would have interfered to any material extent in the passing. Therefore, we must conclude that the Pan Virginia was responsible for bringing about the suction which directly caused the collision. The situation as disclosed in The Varanger, 45 F.2d 608 was not comparable. Where the fault of one vessel is clear and inexcusable the evidence, in order to establish fault also on the part of the other vessel, must be clear and convincing. The Victory and The Plymothian, 168 U.S. 410 [18 S.Ct.

149, 42 L.Ed. 519]; The Bright, [4 Cir.] 124 F.2d 45."

The decree of the District Court is affirmed.

Affirmed.