## AMERICAN TRADING & PRODUCTION CORP. v. T. J. STEVENSON & CO., Inc., et al.

## T. J. STEVENSON & CO., Inc. v. THE AMERICAN TRAVELER et al.

## THE CROWN TRADER.

## THE THOMAS WOLFE.

United States District Court
S. D. New York.

June 17, 1953.

Hagen, Senecal & Eidenbach, New York City, by C. W. Hagen and R. A. Hagen, New York City, for American Trading.

Dow & Symmers, New York City, W. E. Dow, Jr., and J. R. Sheneman, New York City, for T. J. Stevenson.

Kirlin, Campbell & Keating, New York City, by R. S. Erskine, New York City, for United States Lines.

SUGARMAN, District Judge.

American Trading & Production Corporation, as owner of the tanker Crown Trader, brought suit (A. 156–151) in personam against T. J. Stevenson & Company, Inc., bareboat charterer of the S. S. Thomas Wolfe, to recover its damages sustained when the Thomas Wolfe collided with the Crown Trader on January 3, 1948 in Baltimore Harbor. The respondent answered and impleaded the United States Lines Company, owner of the S. S. American Traveler. Thereafter, T. J. Stevenson & Company, Inc., brought suit (A. 156–347) in rem against the S. S. American Traveler and against the S. S. Crown Trader to recover its damages sustained in the same collision. The suits were tried together, and from the evidence I decide as follows:

At about 2:55 P.M., the tanker Crown Trader, inbound heavily laden with a cargo of petroleum products, came to anchor in the northwesterly sector of Anchorage 3, just east of Fort McHenry Channel, in Baltimore Harbor. This anchorage was customarily used to anchor vessels while they waited for an available berth upstream. When a berth was ready, a waiting ship would return to Fort McHenry Channel, on which Anchorage 3 abuts, and then pro-

ceed up the Patapsco River to her berth. The channel at the point involved in these suits is 600 feet wide.

Captain Cullison, a pilot, had brought the Crown Trader in from the sea to the anchorage to await the readiness of her unloading berth at the Continental Oil Company dock, to which she was navigated later that night.

At the time of the collision in suit the Crown Trader lay on the western extremity of the anchorage, her bow facing in a northerly direction and her stern protruding somewhat into the adjacent Fort McHenry Channel. Her stem to stern axis formed an angle of about forty-five degrees with the line of the channel. Although improperly anchored,[1] this encroachment on the channel in no way contributed to her collision with the Thomas Wolfe and it was not such a fault as will lessen the Crown Trader's recovery herein.[2] She was plainly visible (all parties agreeing that the weather was clear and visibility good) and her position could not interfere with vessels prudently navigating Fort McHenry Channel.[3] She was properly lighted[4] and otherwise blameless for the accident.

At about 5:47 P.M., the Thomas Wolfe, destined for Genoa, Italy, and heavily laden with a cargo of coal, with a mean draft of about 27 feet 6 inches, left her berth at the Standard Oil Docks, on the east side of Northwest Harbor, to proceed to sea by way of Fort McHenry Channel. The Thomas Wolfe is a Liberty ship with 2500 horsepower engines making a maximum speed of 11 knots. She is 422 feet long, 57 feet wide and, with her cargo, weighed over 10,000 tons.

At about 5:50 P.M., the American Traveler, a C-2 cargo ship, 447 feet in length and 63 feet wide, had cleared her dock at Pier 6, Locust Point on the west side of Northwest Harbor, and she too was going to sea by way of Fort McHenry Channel. She was light, carrying less than a half load of cargo, and was on her way to Philadelphia. Her mean draft was about 16 feet 2 inches. The American Traveler makes a top speed of 16½ knots with her steam turbine engines which develop 6000 horsepower. Her gross tonnage is over 8000 tons.

As the Thomas Wolfe entered the channel, the Crown Trader was observed more than a mile ahead off the port bow. Shortly thereafter, the American Traveler, at half speed, fell in astern of the Thomas Wolfe at a distance of about one-third mile. Gradually overtaking the Wolfe, the Traveler, doing about 7 knots, blew a one blast signal for permission to pass. Captain Roberts, pilot of the Traveler, also had observed the Crown Trader in Anchorage 3 as the Traveler rounded Lazaretto Point and he correctly judged that she was lying at anchor. The pilot of the Wolfe, Captain Rice, thinking that the Crown Trader was backing into the channel, replied with the multiple blast danger signal. Thereupon, the Traveler's engines were ordered stopped. Shortly after 6:00 P.M., the Traveler repeated the one blast signal and received a second danger signal from the Wolfe. At about 6:04 P.M., the Wolfe recognized that the Crown Trader was at anchor and did not constitute a possible peril to the Traveler's safe passing, and when the Traveler, about ¼ mile astern, again asked permission to pass, the Wolfe granted it with one blast. The Traveler, which meanwhile had resumed half speed, thereupon proceeded to overtake the Wolfe at full speed.

---

1. 33 U.S.C.A. § 409.

2. Philip v. The William F. Meseck, D.C. S.D.N.Y.1947, A.M.C. 800, 815 [not otherwise reported].

3. Griffin on Collision, § 151, pp. 359, 360.

4. There was evidence that, although anchored, the Crown Trader's port running light was visible to vessels running downstream. However, even if she were improperly lighted, the appearance of the running light could in no wise have caused the collision since, as will appear, both the Thomas Wolfe and the American Traveler were, while quite some distance away, apprised of the fact that she was at anchor and not backing out. Tide Water Associated Oil Co. v. The Syosset, 3 Cir., 203 F.2d 264.

When the Wolfe received the Traveler's first request to pass, she was at half speed making about 6 knots and had just rounded Lazaretto Point. Her course was laid somewhat to the west of the center line of the channel. She maintained this course until just before the Traveler started to pass. Discounting to some extent the testimony of the Wolfe's witnesses to the effect that their vessel was well over by the western line of the channel, I find that the Wolfe was just in the west half of the channel from the time she entered it until shortly before she was forced over to the east half when overtaken by the Traveler.

The Wolfe had gone from half speed ahead to full ahead about the time when the first passing request was made. When the second danger signal was blown, her speed had been reduced to slow ahead. When permission to pass was given the Wolfe was making about 6 knots and her engines were almost simultaneously put at half speed, which maintained her 6 knot speed and would have maintained this speed while the Traveler passed, if the passing had been successful.

When the Traveler's bow started to lap the stern of the Wolfe they were both pursuing parallel courses and the latter was about abreast of buoy "17M" marking the southern extremity of Anchorage 1 on the west line of Fort McHenry Channel. The Traveler was doing about 12 knots while the Wolfe was doing about 6. The Wolfe was, at this time, about ⅓ mile from the stern of the Crown Trader as the latter lay at anchor. When the passing began, had the vessels been abeam, the distance between their widest points on the passing sides would have been no more than 100 feet. This proximity of the Traveler to the Wolfe, coupled with the former's high rate of speed, created a suction sufficient to draw the stern of the Wolfe to starboard as the Traveler began to come up alongside. Captain Rice, the pilot on the bridge of the Wolfe, ordered hard right rudder and full speed ahead when he realized what was happening. It appears that when his vessel came under the influence of the suction created by the close passing of the Traveler, he had two alternatives between which to choose in order to attempt to avert disaster: (1) to put his rudder hard right and increase his speed to full ahead in order to add to the effect of his rudder, or (2) to order his engines reversed and drop his anchors. He chose the former course and this maneuver appears to have checked briefly the port bow sheer which necessarily followed the movement of the Wolfe's stern to starboard. However, as the Traveler drew ahead, the sheer resumed and continued, sweeping the Wolfe's bow further to port. Rice first employed the first alternative and did not reverse his engines and drop his anchors immediately on the occurrence of the sheer because of his well founded fear that such action would bring him into collision with the overtaking vessel. Despite his efforts to regain control of the Wolfe, Rice became aware that he had not succeeded and that the Wolfe was heading for the midline of the Crown Trader and, about thirty seconds before the collision, he blew a danger signal, and employed the second alternative of reversing his engines and ordering both anchors dropped. The port anchor was let go, but before the starboard anchor could be dropped, the port bow of the Wolfe struck a glancing blow to the Crown Trader's "port side aft at the counter" damaging both vessels. The collision occurred at about 6:11 P.M.

The Wolfe was thereupon anchored in Anchorage 3. The Traveler, after passing, slowed when the noise of the Wolfe's anchor chains and the danger signal were heard, but seeing that no assistance was needed, she continued on her way.

That an overtaking vessel will create a condition in the water, i. e., suction, which influences the overtaken vessel under certain circumstances is a well known phenomenon and the overtaking vessel must not unreasonably cause such a condition in executing the maneuver.[5] The relative size and draft of the vessels, the depth of the water, and the type of channel determine to some extent the strength of the force ex-

5. Griffin on Collision, § 257, p. 586 et seq.

erted on the overtaken vessel. Two factors that largely determine the extent of the influence of suction are the distance separating the vessels and the speed of the overtaking vessel. The Traveler was under a duty to pass at a reasonably safe distance and at a reasonable speed and I find her derelict in fulfilling both these obligations. The result was that the Wolfe at the critical time came completely under the control of the suction created by the Traveler's proximity and excessive speed so that she lost her ability to control her course and she eventually came into collision with the Crown Trader.

The Traveler contends that the vessels were about 300 feet apart at the time of passing and that suction played no part in causing the Wolfe's sudden erratic course. As heretofore stated, the distance between the vessels at time of passing is found not to have exceeded 100 feet.

The Traveler suggests that some defect in the Wolfe's steering gear caused the collision. I accept the testimony of the Wolfe's witnesses that her steering gear was functioning properly. Thus, I find that the only credible explanation for the Wolfe's sudden sheer was the suction created by the Traveler negligently passing too close and at an excessive speed.

The Traveler further contends that, even assuming that she caused the sheer, nevertheless, the conduct of the Wolfe's pilot in failing to reverse his engines and drop his anchors immediately to check the lurch to port, was such intervening gross negligence as to exonerate the Traveler and impose total blame for the disaster on the Wolfe. However, Lewis, the Wolfe's expert witness, convincingly testified that this maneuver would quite possibly have brought the Wolfe into collision with the Traveler.

The Traveler's contention that the Wolfe should have blown a danger signal at the start of the sheer is also without merit. Even if the omission to sound a warning was not excusable as an error made in extremis, it does not appear that such a signal would have been effective in averting the collision. Further, the dangerous situation in which the Wolfe found herself was apparent to the Traveler and she cannot complain of failure to be notified of the obvious.[6]

I am convinced that the Wolfe's navigation was consonant with principles of reasonably prudent seamanship under all circumstances presented. The Ohio[7] is not to the contrary. The difference in speed between the overtaken Siberia and the overtaking Mather in that case was only one mile per hour. Suction was found to have had only a minor influence on the Siberia. Judge Lurton did not disagree with the district court in holding that the Siberia was at fault in not stopping and backing as soon as she veered because if she backed at once, the collision with the Ohio would have been avoided. In the instant case, however, such action would have resulted in a collision with the overtaking Traveler, the suction being so strong. The Siberia was condemned not only for failure to stop and reverse but for failure to prove that the gross mismanagement of her helm did not contribute to the disaster.

Whatever slight doubt may be entertained of the proper navigation of the Wolfe when she was put in a situation of extreme danger by reason of the fault of the Traveler has been resolved in the Wolfe's favor.[8]

The Traveler also urges that the Wolfe was guilty of fault in not maintaining her speed after assenting to the passing. However, I find that she did maintain a speed of approximately 6 knots from the time of giving the one blast passing signal until the sheer started. The Wolfe's engines were going full ahead when the first request to pass was blown. She went to slow ahead when the first danger signal was blown and to half ahead after the second danger signal, a few seconds within giving the assent. When the telegraph signal for slow ahead was given, the Wolfe had been on full ahead for several minutes. Although the

---

6. The Queen City, D.C.E.D.Mich., 189 F. 653, 660.

7. 6 Cir., 91 F. 547.

8. The Reliance, 2 Cir., 25 F.2d 625, 627; The Atlantis, 6 Cir., 119 F. 568, 572.

engines were then put on slow ahead and continued at that speed for about one minute, the vessel did not immediately lose the headway acquired while at full ahead and as her pilot testified she was making 6 knots when the assent was given. A few seconds before or after the passing signal was blown the engines went to half ahead and this maintained her 6 knot speed until the Traveler began to pass her.

The sole proximate cause of the collision of the Thomas Wolfe with the Crown Trader was the fault of the American Traveler. In proceeding A. 156–151 a decree will be entered dismissing the libel of the American Trading & Production Corporation against T. J. Stevenson & Company, Inc., without costs and in favor of American Trading & Production Corporation against United States Lines Company with costs. In proceeding A. 156–347 a decree will be entered in favor of T. J. Stevenson & Company, Inc., against S. S. American Traveler with costs and dismissing T. J. Stevenson & Company, Inc.'s libel against S. S. Crown Trader without costs.

Such decrees should each provide for the appointment of a commissioner to determine the amount of the damages sustained by the Crown Trader and the Thomas Wolfe. Settle findings, conclusions and decrees in conformity with the foregoing.