## ORE S. S. CORP.
### v.
## THE PAN VIRGINIA.
## PAN AMERICAN PETROLEUM & TRANSPORT CO.
### v.
## THE STEELORE et al.
### No. 3466.

United States District Court
D. Maryland.
July 7, 1954.

Lord, Whip & Coughlan, Baltimore, Md., for Ore S.S. Corp., libellant and claimant of Steamship Steelore and cross-respondent.

Ober, Grimes & Stinson (Messrs. William A. Grimes and Southgate L. Morison), Baltimore, Md., for Pan American Petroleum & Transport Co., claimant, of Steamship Pan Virginia and cross-libellant.

**WILLIAM C. COLEMAN, Chief Judge.**

This case involves a collision which occurred on May 10, 1952, in the so-called Cut-off Channel connecting the Brewerton and the Craighill Channels in the approaches to Baltimore Harbor, between the Steelore, owned by the libellant, the Ore Steamship Corporation, and the Pan Virginia, owned by the cross-libellant, the Pan American Petroleum & Transport Company.

The Steelore is a twin screw steam vessel, built in 1922, length 572 feet, beam 72 feet, and at the time of the collision was fully loaded with iron ore, drawing 34 feet forward and 35 feet aft. The Pan Virginia is a T–2 type tanker, 520 feet long, 68 feet beam, and at the time of the collision was carrying a full cargo of Venezuelan crude oil and drawing approximately 29 feet forward and 31 feet aft.

There is no real dispute as to the following facts: On the afternoon of May 10, 1952, the weather being mild with good visibility and the tide about slack low water, the Steelore, under control of a Maryland pilot, was proceeding up the Craighill Channel destined to the Bethlehem Steel Company plant at Sparrows Point. The Pan Virginia was also inward bound to Baltimore, and was following the Steelore up the Craighill Channel. The Steelore was proceeding at a speed of 7 or 8 knots, and the Pan Virginia, at a speed of about 12 knots, so that she was gradually overhauling the Steelore. When the Steelore had straightened out on the left hand, or the black buoy side of the next, or Cut-off Channel, the two vessels then being not more than a mile apart, the Pan Virginia blew a one blast passing signal which was answered by the Steelore with a one blast. Thereupon the Pan Virginia went full speed ahead (12 knots) on her own starboard, or the red buoy side of the Channel. Both vessels continued on their established courses for several minutes when the Pan Virginia's bow began to overlap the stern of the Steelore, which, at this time, took a sheer to the right, towards the course of the Pan Virginia. The Pan Virginia's port side, about abreast of her foremast, struck the Steelore about abaft her bridge. The Channel where the collision occurred is 600 feet wide, with a depth of about 39 feet.

The Maryland pilot in charge of the Steelore died suddenly a few weeks after the accident, and there is no testimony from him in any form except that given three days after the accident at a Coast Guard hearing. He then testified that he received two one blast passing signals from the Pan Virginia, the first one when the Steelore was in the angle between the Craighill and Cut-off Channels, and the second one when the Steelore was approaching no. 9-K buoy in the Cut-off

Channel, when the Pan Virginia was about a half mile astern. He testified that he assumed the Pan Virginia did not intend to pass in the straight of the Channel because this was not customarily done, but blew for a passing in order to advise the Steelore of an intended passing in the turn of the Channel which was wider; that he answered both of these passing signals with one blast; that he did not look astern to see whether the Pan Virginia altered her course at any time thereafter; that when the two vessels first overlapped, he could not say how far they were apart, but that after the overlap occurred, the Steelore began to sheer to starboard, whereupon her port engine was stopped in order to try to break the sheer and her wheel ordered hard left, but that nevertheless, the Steelore continued to sheer to her right, and after about 2 minutes of this sheering, the vessels collided; that the Steelore stopped her starboard engine (her port engine having already been stopped) and then dropped anchor to try to prevent running into the bank on her port side, but she nevertheless went aground. He further stated that he had piloted the Steelore a number of times before; that she did not handle particularly well, but that in his opinion, the cause of the collision was suction which sheered the Steelore to the right, brought about by the deeply loaded tanker passing too closely.

At the trial the testimony of the master of the Steelore was, for the most part, substantially the same as that of her pilot. He also testified that when the overlap of the two vessels first began, they were only 40 or 50 feet apart.

The chief mate of the Steelore, who was stationed on her bow at the time of the collision, also testified at the trial but he was a rather poor witness and added little. He stated that the Pan Virginia appeared to be only about 30 feet away when the Steelore began to sheer to the right. There was no credible testimony by any witness for the Steelore that it was unsafe to pass in that part of the Channel where the Pan Virginia attempted to pass.

The second officer of the Steelore testified at the trial that he was on the bridge as his vessel was being overtaken by the Pan Virginia, which had been proceeding dead astern of the Steelore and did not vary her course in order to pass until she was only approximately 600 feet astern of the Steelore, when she made a sharp turn to starboard and then swung back to port in order to remain in the Channel, which indicated to him that she was out of control. The rest of the testimony of this witness was not materially different from that of the master of the Steelore.

The testimony of the helmsman of the Steelore taken by deposition is fragmentary. He appears to have been a rather slow-minded individual. He was unable to say whether or not the bow of the Steelore began to swing to starboard before he put her wheel hard left, but he testified that after he had done so, her bow "kept walking around to the starboard all the time."

On behalf of the other vessel, the Pan Virginia, the pilot testified at the hearing and there was also the deposition testimony of the master, the chief mate and the helmsman, this last named person having testified at a Coast Guard hearing.

The pilot testified that the Pan Virginia, proceeding at about 10 knots, was gradually overtaking the Steelore, when at 4:06 p. m., he blew a one blast passing signal, to which the Steelore replied with one blast at 4:16; that the Pan Virginia was proceeding about 50 feet from her own right side of the Channel and the Steelore was on her own right side; that when the Pan Virginia first overlapped the stern of the Steelore, the former was making between 11 and 12 knots, and the two vessels were from 150 to 200 feet apart; that the Pan Virginia never took any sheer and was never out of control; that he was aware of the necessity for not taking the Pan Virginia too close to the Steelore, although he admitted knowing nothing about suction under the given circumstances, and that it was his

speculation that the Steelore must have had engine or steering trouble.

The master of the Pan Virginia testified by deposition that he had held this position for several years prior to the collision; that as the Steelore preceded the Pan Virginia into the Craighill Channel, she was a mile or two ahead; that as the Pan Virginia gained upon her, the Pan Virginia gave a one blast signal, the Steelore then being a mile or more ahead; and about in the center or a little to the left of the center of the Channel; that no reply was received from the Steelore; that a minute later, the Pan Virginia's engines were stopped, after another minute were started half ahead and continued at that speed for 7 minutes until they were given full speed ahead, and a minute later the Pan Virginia blew the Steelore another one blast passing signal which she answered with one blast; that at this time the Steelore was a little to the left and the Pan Virginia a little to the right of the center of the Channel. The master further testified that upon receiving the assenting signal from the Steelore, the Pan Virginia was brought further to the right side of the Channel, still proceeding at full speed; and that when about 200 feet from the right hand buoys with the Pan Virginia's bow just overlapping the Steelore's stern, the latter sheered to starboard; that thereupon the Pan Virginia's speed was reduced to dead slow ahead and her wheel put hard right; that when the sheer of the Steelore was seen to continue, the engines of the Pan Virginia were stopped, then put full astern, the starboard anchor was dropped and a general alarm given as the two vessels came together; that no danger signal was ever received from the Steelore. The master further testified that he had had no trouble in steering the Pan Virginia on this or any previous occasion; that he considered there was nothing inherently dangerous in attempting to pass the Steelore as and when he did; that he discussed the passing with his pilot who said we should pass as we endeavored to do, and that he did not know what caused the collision.

The chief mate of the Pan Virginia, who testified by deposition, stated that he went to the bow just after the Pan Virginia had sounded her first one blast, to which he heard no answer from the Steelore; that when the Pan Virginia blew her second one blast passing signal and the Steelore answered, the latter vessel drew to her port slightly and the Pan Virginia went to her starboard, namely, the Steelore went to within about 175 feet of the black buoys on her port side, and the Pan Virginia to within about 140 feet of the red buoys on her starboard side; that the two vessels were about 150 feet apart before the Steelore began to sheer, although this witness had testified before the Coast Guard shortly after the collision that the two vessels were separated by only about 75 feet when the Steelore began to sheer; that it was the suction of the two deeply loaded ships in the relatively narrow Channel that was at least partly responsible for the collision, as he had testified before the Coast Guard.

The testimony of the helmsman of the Pan Virginia, given to the Coast Guard, adds little that is material to the testimony of others on that vessel which we have just analyzed. He stated that when the bow of the Pan Virginia began to overlap the stern of the Steelore, the two vessels were not more than approximately 30 feet apart; that the Pan Virginia steered satisfactorily and that it was his opinion that the sheering of the Steelore was the cause of the collision.

The provisions of the Inland Rules applicable to the present case are Rule VIII of Article 18, Article 21, Article 23 and Article 24, the pertinent parts of which are as follow: Art. 18, Rule VIII: *"When steam vessels are running in the same direction, and the vessel which is astern shall desire to pass on the right or starboard hand of the vessel ahead, she shall give one short blast of the steam whistle, as a signal of such desire, and if the vessel ahead answers with one blast, she shall direct her course to starboard; or if she shall desire to pass on the left or port side of the vessel ahead, she shall*

give two short blasts of the steam whistle as a signal of such desire, and if the vessel ahead answers with two blasts, shall direct her course to port; or if the vessel ahead does not think it safe for the vessel astern to attempt to pass at that point, she shall immediately signify the same by giving several short and rapid blasts of the steam whistle, not less than four, and under no circumstances shall the vessel astern attempt to pass the vessel ahead until such time as they have reached a point where it can be safely done, when said vessel ahead shall signify her willingness by blowing the proper signals. The vessel ahead shall in no case attempt to cross the bow or crowd upon the course of the passing vessel." (Emphasis supplied.) 33 U.S.C.A. § 203.

"Art. 21. Where, by any of these rules, one of the two vessels is to keep out of the way, the other shall keep her course and speed." 33 U.S.C.A. § 206.

"Art. 23. Every steam vessel which is directed by these rules to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed or stop or reverse." 33 U.S.C.A. § 208.

"Art. 24. Notwithstanding anything contained in these rules every vessel, overtaking any other, shall keep out of the way of the overtaken vessel. * * *" 33 U.S.C.A. § 209.

■■ Applying the aforegoing rules to the facts as disclosed by the rather extensive testimony given on behalf of both vessels, we are satisfied that it was not inherently dangerous for the Pan Virginia to attempt to pass the Steelore where she did, namely, where the Cutoff Channel was straight and 600 feet wide. There is no testimony from any witness to the contrary, although there is testimony that it was more customary to pass at the turn where the channel is wider. Thus, we conclude that it was appropriate for the Pan Virginia to undertake to pass the Steelore, and for the Steelore to assent to being passed, on her starboard hand. However, it is equally conclusive from the testimony that the size, draft and speed of both vessels, and also the distance at which one vessel sought to pass the other, were very material factors. In the present case both vessels were large and fully loaded. The Steelore was drawing as much as 35 feet, and the Pan Virginia as much as 31 feet. The latter was attempting to pass at full speed and while the testimony is not uniform, it is reasonable to conclude that when the Pan Virginia began to overlap the Steelore the two vessels were not more than 100 feet apart. The vessels themselves took up about 150 feet of the width of the Channel. It is admitted by those in charge of the Pan Virginia that she was attempting to make the passing at full speed, that is, approximately 12 knots. We find nothing in the testimony to warrant a finding that the Steelore attempted to do other than what she was required to do after assenting to the passing, namely, to hold her course and speed. When there was an overlap of the two vessels the sheer which the Steelore took was, we are satisfied by the weight of the credible evidence, due to a cause beyond the control of those in command of her, namely, suction brought about by the excessive speed of the Pan Virginia, and the fact that she was attempting to pass too closely to the Steelore even had she substantially reduced her speed, because of the size and deep draft of both vessels.

The following statement in the opinion in American Trading & Production Corp. v. T. J. Stevenson & Co., D.C., 113 F. Supp. 332, a decision of the District Court for the Southern District of New York, in 1953, is, we believe, directly applicable to the present case. There a vessel at 12 knots overtaking another vessel at 6 knots, in a 600 foot channel, also in Baltimore Harbor, was held solely at fault for the leading vessel going out of control and colliding with a third vessel lying at anchor at the edge of the channel. The Court said, 113 F.Supp. at pages 334–335: "That an overtaking vessel will create a condition in the water, i. e., suction, which influences the overtaken vessel under certain circumstances is a well known phenomenon and the over-

taking vessel must not unreasonably cause such a condition in executing the maneuver. The relative size and draft of the vessels, the depth of the water, and the type of channel determine to some extent the strength of the force exerted on the overtaken vessel. Two factors that largely determine the extent of the influence of suction are the distance separating the vessels and the speed of the overtaking vessel. The Traveler was under a duty to pass at a reasonably safe distance and at a reasonable speed and I find her derelict in fulfilling both these obligations. The result was that the Wolfe at the critical time came completely under the control of the suction created by the Traveler's proximity and excessive speed so that she lost her ability to control her course and she eventually came into collision with the Crown Trader.

"The Traveler contends that the vessels were about 300 feet apart at the time of passing and that suction played no part in causing the Wolfe's sudden erratic course. As heretofore stated, the distance between the vessels at time of passing is found not to have exceeded 100 feet.

"The Traveler suggests that some defect in the Wolfe's steering gear caused the collision. I accept the testimony of the Wolfe's witnesses that her steering gear was functioning properly. Thus, I find that the only credible explanation for the Wolfe's sudden sheer was the suction created by the Traveler negligently passing too close and at an excessive speed.

"The Traveler further contends that, even assuming that she caused the sheer, nevertheless, the conduct of the Wolfe's pilot in failing to reverse his engines and drop his anchors immediately to check the lurch to port, was such intervening gross negligence as to exonerate the Traveler and impose total blame for the disaster on the Wolfe. However, Lewis, the Wolfe's expert witness, convincingly testified that this maneuver would quite possibly have brought the Wolfe into collision with the Traveler.

"The Traveler's contention that the Wolfe should have blown a danger signal at the start of the sheer is also without merit. Even if the omission to sound a warning was not excusable as an error made *in extremis*, it does not appear that such a signal would have been effective in averting the collision. Further, the dangerous situation in which the Wolfe found herself was apparent to the Traveler and she cannot complain of failure to be notified of the obvious."

See also Independent Pier Co. v. Charles Warner Co. (The Gulftrade), 278 U.S. 85, 49 S.Ct. 45, 73 L.Ed. 195; The Potomac, 70 App.D.C. 215, 105 F.2d 94; Griffin on Collisions, Sec. 257.

We find no ground for holding, as has been contended on behalf of the Pan Virginia, that if she is found to have been at fault, it was nevertheless a case of mutual fault, and that both vessels must be held liable. As already stated, it was not inherently dangerous for the Pan Virginia to pass the Steelore in this particular part of the Channel. Therefore, the Steelore was not at fault in assenting to the passing. It was the excessive speed of the Pan Virginia, and the fact that in trying to pass, she kept much too close to the Steelore, that alone constituted the fault. The Channel was sufficiently wide to enable her to keep as much as 250 to 300 feet away from the Steelore in passing. If she had done so, there is nothing to indicate that suction would have interfered to any material extent in the passing. Therefore, we must conclude that the Pan Virginia was responsible for bringing about the suction which directly caused the collision. The situation as disclosed in The Varanger, D.C., 45 F.2d 608 was not comparable. Where the fault of one vessel is clear and inexcusable the evidence, in order to establish fault also on the part of the other vessel, must be clear and convincing. The Victory and The Plymothian, 168 U.S. 410, 18 S.Ct. 149, 42 L.Ed. 519; The Bright, 4 Cir., 124 F.2d 45.

A decree will be signed in accordance with this opinion holding the Pan Virginia solely liable for the collision.