**COMPANIA MARITIMA MADRILENA,
S.A., Appellant,**

v.

**ZIM ISRAEL NAVIGATION COMPANY,
Ltd. and Northern Assurance Company, Appellees.**

No. 18275.

United States Court of Appeals
Fifth Circuit.

Nov. 2, 1960.

Rehearing Denied Dec. 6, 1960.

Cody Fowler, Fowler, White, Gillen, Humkey & Trenam, Tampa, Fla., James

O. Davis, Jr., Tampa, Fla., of counsel, for appellant.

L. Robert Frank, Tampa, Fla., Herbert P. Reid, Fort Lauderdale, Fla., Allen, Dell, Frank & Trinkle, Tampa, Fla., for appellee, M/S Dagan and Zim Israel Navigation Company, Ltd.

Before RIVES, Chief Judge, and TUTTLE and WISDOM, Circuit Judges.

TUTTLE, Circuit Judge.

This is an appeal from a libel in a case in admiralty which arose as a result of a collision between two ships in Tampa Bay.

The Jarama is a steamship of Spanish registration, weighs 4937 gross tons, is 413½ feet in length and 52 in beam, has a home port of Cadiz, Spain, and is owned by the Compania Maritima Madrilena, S.A., a Spanish corporation with offices in Madrid. The Dagan is a vessel of Israeli registry, weighing 5013 gross tons, is 380 feet in length and 58 in beam, and is owned by Zim Israel Navigation Company, Ltd.

Both ships were anchored off Egmont Key, Florida, on August 30, 1956, at about 2:00 A.M., when they took aboard compulsory pilots and began to proceed inbound toward the channels of Tampa Bay, the Jarama in the lead. As the ships entered a portion of the channels known as "B Cut," the Dagan, in accordance with Rule VIII of Article 18 of the Inland Rules, 33 U.S.C.A. § 203, requested permission to pass the Jarama, which permission was duly granted. Thereupon the Dagan increased her speed to about 12½ knots, and the Jarama continued her speed of approximately 8½ to 9 knots. The channel was, at the point selected for the passing, about 400 feet wide and 34 feet deep, with a depth outside the channel of about 23 to 26 feet. It was undisputed that the night was clear, that visibility was good, and that the wind was East/Northeast with a Beaufort force of no more than 2.

In the course of passing, when the stem of the Dagan arrived at a point no more than 50 feet past the stern of the Jarama,

the Jarama suddenly sheered to her port side, on which side the Dagan was passing, and immediately sounded a danger signal, upon which the Dagan answered the signal and stopped her engines. Both vessels maneuvered so as to avoid a collision; the port quarter of the Jarama, however, struck the starboard side of the Dagan at a point slightly aft of amidships. The testimony was in conflict as to the distance between the two ships on the lateral courses which they were following; the trial judge recognized that the distance was between 50 and 150 feet and ascribed the conflict to "the difficulty in estimating distance under the conditions present, it being in the nighttime."

The only material issue involves the cause of the accident. The Dagan contends that the sheer was occasioned solely by the mishandling of the pilot and crew of the Jarama, or that it resulted from idiosyncrasies peculiar to the Jarama, or that poor steering in the Jarama resulted from the fact that she was "down-by-the-head," she drawing 24 feet forward and 23½ feet aft; in any event, contends the Dagan, the sheer was not caused through any fault of, nor force generated by, the Dagan. The Jarama defends on the theory that a force put into motion by the movement of the bow of the Dagan through the water pushed the stern of the Jarama to its own starboard, with the result that its bow moved toward port and into the path of the Dagan. Jarama thus admits the sheer but characterizes it as involuntary and so contends that the collision occurred not through the faults of the ship or through mishandling but through the "pushing force" and the nearness of the Dagan.

While the Jarama offers some evidence to show that such a pushing force does in fact exist, it has been unable to cite any cases which recognize that alleged force. In fact, the single case upon the subject decided by the Court of Appeals for the Second Circuit in 1913, rejects the theory:

"We do not understand there is any contention that the movement of the Princeton 'sucked' the bow in, since her stern had not yet come near enough to the Glidden's bow to exert any suction on it. The sole contention is that there is a pushing force exerted by the water displaced as a vessel's bow moves through it. The theory is that, since the displaced water must go somewhere, it must run off to port and starboard. There is no judicial acceptance of such theory, except, possibly the deliverance of a Canadian trial judge. Cadwell v. Ship Bielman, 10 Exchequer Rep. Canada, 155. It would seem that if such a phenomenon were known it would find place in standard books on navigation. * * * [We] cannot take judicial notice that there is such a force. No textbook tells of it; no such phenomenon has come within our individual observation; we do not know it to be 'a fact in nature.' The theory advanced that because water is displaced at the bow it will be pushed off either side, because there is nowhere else for it to go, we do not find persuasive. There is displacement only because the vessel moves forward; she moves forward only because the screw behind her is pushing the water back; it seems to us more reasonable to suppose that the displaced particles of water take the shortest possible course, some along the sides of the ship, some along her bottom, to the place where room has been made for them by the movement of the screw and the consequent backward movement of the particles of water which the screw has kicked. Possibly this theory of what will happen may be incorrect; but certainly we cannot accept the theory advanced * * * unless the weight of testimony supports it * * *." The Princeton, 209 F. 199, at pages 200–201.

The cases have long recognized the force of suction which can be generated by ships in such circumstances, see, e. g., Ore S.S. Corp. v. The Pan Virginia, D.C.,

123 F.Supp. 346, affirmed, 4 Cir., 220 F.2d 688, but the matter of suction was not urged here, in a case practically identical to that of the Pan Virginia, supra. And, it should be pointed out, if there is any scientific authority for the "pushing force" theory, it is strange that the theory has not been advanced until now in any case since 1913.

Clearly, the burden of proof was upon the Jarama to establish the truth of what it claimed was the cause of the sheer; especially is this so in a case where, as here, a party is attempting to establish the truth of a novel theory. Of course, had the Jarama been successful in establishing the truth of its theory, then the trial court might have been justified in finding for the Jarama. But the burden was not satisfied, the theory was not proved, and the judgment of the trial court should be affirmed.

The judgment is
Affirmed.